## STATE OF CONNECTICUT *v.* CAESAR O'NEIL (SC 16177)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

50

Argued January 17—officially released July 23, 2002

*Neal Cone*, senior assistant public defender, for the appellant (defendant).

*Susann E. Gill*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Stephen J. Sedensky III*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

ZARELLA, J. The defendant, Caesar O'Neil, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-

54a.[1] The defendant claims that the trial court improperly: (1) delivered a Chip Smith instruction[2] that, by its language, was coercive upon minority view members of the jury;[3] and (2) admitted into evidence information regarding two unrelated criminal matters that were pending at the time of his trial. We find no impropriety in either of the trial court's actions and, therefore, affirm the judgment of the trial court.

The record reveals the following relevant facts and procedural history. At approximately 2:50 a.m. on July 4, 1993, the victim, Orlando Suter, was riding as a passenger in a stolen white Acura Legend driven by Eddie Smalls. Smalls and the victim were proceeding westbound on Connecticut Avenue in Bridgeport. As Smalls and the victim approached a traffic light at the intersection of Hollister and Connecticut Avenues, Smalls noticed the defendant and two other individuals seated in a dark sedan in a parking lot on the right side of the street. Smalls knew that the defendant was a member of a rival gang and proceeded quickly through the intersection. The sedan in which the defendant was a passenger then pursued the Acura at a high rate of speed. Smalls thereafter turned right onto Union Avenue and

---

[1] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] "A Chip Smith instruction reminds the jurors that they must act unanimously, while also encouraging a deadlocked jury to reach unanimity. See State v. Smith, 49 Conn. 376 (1881); see also 5 Connecticut Practice, D. Borden & L. Orland, Connecticut Criminal Jury Instructions (1986) § 4.8." (Internal quotation marks omitted.) State v. Pare, 253 Conn. 611, 616 n.4, 755 A.2d 180 (2000); accord State v. Feliciano, 256 Conn. 429, 431 n.3, 778 A.2d 812 (2001). "A similar jury instruction, known as an Allen charge, is utilized in the federal courts. Allen v. United States, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896)." State v. Feliciano, supra, 431 n.3.

[3] For purposes of the present case, we use the terms "minority view members of the jury" or "minority view jurors" to refer to the smaller in number of the two groups of jurors constituting the whole jury that differed in their view as to whether the defendant was guilty of murder in violation of General Statutes § 53a-54a.

the sedan followed. The sedan eventually pulled even with the driver's side of the Acura, at which time the defendant, who was sitting in the front passenger seat of the sedan, and the other passenger exchanged gun fire with Smalls and the victim. The victim was shot in the head after which the sedan sped away. The victim subsequently was ejected from the Acura as Smalls turned onto a side street. Smalls did not stop to assist the victim. He abandoned the Acura shortly thereafter and fled on foot. At approximately 3:15 a.m., Bridgeport police located the lifeless body of the victim in the roadway on Shelton Street. Several hours later, the police recovered the Acura on a nearby street.

The defendant subsequently was arrested and charged in connection with the victim's death. While awaiting trial on the murder charge, the defendant also was charged with attempt to commit murder in violation of General Statutes §§ 53a-54a and 53a-49,[4] after a correction officer intercepted a letter written by the defendant in code, in which the defendant had solicited another individual to kill Smalls. The two informations were consolidated, and, following a jury trial, the defendant was found guilty on the charge of attempt to commit murder. The jury remained deadlocked on the murder charge, however, and the trial court declared a mistrial as to that charge. The defendant was sentenced to a term of twenty years incarceration in connection with his conviction for attempt to commit

---

[4] General Statutes § 53a-49 provides in relevant part: "(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. . . ."

murder.[5] Thereafter, the defendant was retried on the murder charge and, following a jury trial, was convicted and sentenced to a term of fifty years incarceration, to run consecutively to the earlier imposed sentence. This appeal followed. Additional facts and procedural history will be discussed as necessary.

I

The defendant first claims that the language of the Chip Smith instruction that the trial court delivered to the jury was inherently coercive upon the jury and, therefore, violated his rights under the Connecticut and federal constitutions. Specifically, the defendant contends that the instruction infringed upon his right to a unanimous jury verdict under article first, §§ 8[6] and 19,[7] of the constitution of Connecticut inasmuch as the trial court's instruction directed minority view jurors to reconsider their conclusion in light of the conclusion reached by majority view jurors but did not direct majority view jurors to do the same. The defendant further contends that such an instruction unfairly increased the likelihood of conviction and, thus, violated his due process rights under article first, § 8, of the constitution of Connecticut[8] and the fourteenth

[5] The defendant appealed from the judgment of conviction of attempt to commit murder to the Appellate Court, which reversed the judgment on the ground that there was insufficient evidence to support the conviction. *State* v. *O'Neil*, 65 Conn. App. 145, 172, 782 A.2d 209 (2001). We thereafter granted the state's petition for certification to appeal, limited to the issue of whether the Appellate Court properly had concluded that the evidence was insufficient, as a matter of law, to support the defendant's conviction of attempt to commit murder. *State* v. *O'Neil*, 258 Conn. 932, 785 A.2d 229 (2001). We note that the defendant's pending appeal with respect to the conviction of attempt to commit murder is separate from the present appeal.

[6] Article first, § 8, of the constitution of Connecticut provides in relevant part: "[T]he accused shall have a right . . . in all prosecutions by indictment or information, to a . . . trial by an impartial jury. No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

[7] Article first, § 19, of the constitution of Connecticut provides: "The right of trial by jury shall remain inviolate."

[8] See footnote 6 of this opinion.

amendment to the United States constitution.[9] Finally, the defendant contends that the instruction subverted his state[10] and federal[11] constitutional rights to equal protection and to a jury selected from a fair cross-section of the community[12] because the instruction had the potential to marginalize the only two jurors who, like the defendant, were African-American.[13] Our resolution of all of the defendant's foregoing constitutional claims hinges on our answer to a single question, namely, whether the trial court's Chip Smith instruction improperly pressured minority view jurors into abandoning their position in favor of the position of the

[9] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[10] Article first, § 20, of the constitution of Connecticut provides in relevant part: "No person shall be denied the equal protection of the law . . . ."

[11] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws. . . ."

[12] We previously have stated that article first, § 8, of the constitution of Connecticut encompasses the right to a trial by "an impartial jury drawn from a cross-section of the community." (Internal quotation marks omitted.) *State* v. *Griffin*, 251 Conn. 671, 697, 741 A.2d 913 (1999).

"The sixth amendment to the United States constitution provides in relevant part: 'In all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury . . . .' See *Taylor* v. *Louisiana*, 419 U.S. 522, 528, 95 S. Ct. 692, 42 L. Ed. 2d 690 (1975) (stating 'the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial')." *State* v. *Carrasco*, 259 Conn. 581, 587 n.12, 791 A.2d 511 (2002).

[13] The defendant's argument rests on the following hypothetical: If the only minority view jurors are members of a racial minority group and the defendant also is a member of the same group, then the Chip Smith instruction reinforces the belief of majority view jurors in the correctness of their decision and suggests to majority view jurors that minority view jurors are voting in favor of acquittal out of racial solidarity. We note that the defendant does not argue that the two African-American jurors in the present case were, in fact, among the minority view jurors or that they were coerced in their deliberations. He argues, instead, that the risk of being subjected to such a scenario is sufficient to warrant a new trial and a holding prohibiting the use of Chip Smith instructions.

majority view jurors. Because we answer that question in the negative, we reject the defendant's claims.

The following additional facts and procedural history are relevant to the defendant's claims. Following the presentation of evidence and closing arguments of counsel, the trial court charged the jury, which then began its deliberations. Shortly thereafter, the jury sent a note to the trial court requesting reinstruction on the murder charge and an explanation of how the jury could use a document in evidence, namely, a decryption of the coded letter in which the defendant solicited another individual to kill Smalls, in its deliberations. The trial court briefly explained the purposes for which the jury could consider the letter. Because of the late hour, the trial court declined to address the jury's request for reinstruction on the murder charge until the following morning and thereupon dismissed the jury for the evening. After receiving the additional instruction on the murder charge the following morning, the jury continued deliberations. Soon thereafter, the trial court received a note from the jury foreperson stating that the jury was deadlocked.

The trial court read the note into the record and informed the defendant and the state that the court would deliver a Chip Smith instruction to the jury. Defense counsel objected, stating that the instruction was not warranted in light of the history of the case. Specifically, defense counsel, in objecting to the trial court's decision to deliver a Chip Smith instruction, stated: "[T]his [was] a retrial, there was a mistrial because of a hung jury in the first case, and I think, under the circumstances, it's inappropriate." The trial court overruled the defendant's objection, remarking that the jury had deliberated for a total of less than three hours.

The trial court then gave the following Chip Smith instruction to the jury: "The court feels that this matter

has been well tried. You have heard the evidence and the court is of the opinion that it should give you additional instructions regarding this matter to see whether or not it is within your reach to arrive at a verdict in this matter.

"So with this thought in mind, I wish to state to you at the outset that the additional instructions are not to be construed by you to be coercive in any manner or to compel you to arrive at a verdict. The instructions are designed to aid you in considering your own positions individually and weighing your individual positions against the collective positions or the position of other members of the jury, and after having done so, to reconsider whatever conclusions that you individually may have reached, not to suggest to you in any manner that you are compelled to reach a verdict or must reach a verdict.

"The instructions that I shall give you now [are] only to provide you with additional information so that you may return to your deliberations and see whether you can arrive at a verdict. Along these lines, I would like to state the following to you. Although the verdict to which each of you agrees must express his or her own conclusion and not a mere acquiescence in the conclusion of your fellow jurors, yet in order to bring your minds to a unanimous result, you should consider the question you have to decide not only carefully but also with due regard and deference to the opinions of each other.

"In conferring together, you ought to pay proper respect to each other's opinions and listen with an open mind to each other's arguments. If much the larger number of you reach a certain conclusion, a dissenting juror or jurors should consider whether [his] opinion is a reasonable one when the evidence does not lend to a similar result in the minds of so many of you who are equally honest and equally intelligent who have

heard the same evidence with the same intention with equal desire to arrive at the truth and under the same sanctions of the same oath.

"If the majority of you are for one decision, the minority ought seriously to ask themselves whether they may not reasonably or ought not to doubt their own conclusions when they are not concurred in by most of those with whom they are associated, and they may well distrust the weight or sufficiency of the evidence upon which they rely when it fails to bring the minds of their fellow jurors to the same conclusions that you hold.

"I have stated this to you in order to get you to further consider in your deliberations the opinions of your fellow jurors. This is all. I'm going to ask you to return to the jury room and see if you can arrive at a verdict. . . .

"Now, there is an alternative instruction[14] along the same lines that's a little bit shorter, and it's given for the same reason. Although the verdict to which each juror must agree, of course—although the verdict to which each juror agrees must, of course, be his or her conclusion and not a mere acquiescence in the conclusion of the others, in order to bring minds to a unanimous result, you should, in conferring together, pay proper respect to each other's opinions with candor to each other's arguments. If the much larger number of the panel are for a particular verdict, a dissenting juror or jurors should consider why their conclusion is one that makes no impression upon the minds of the others who are equally honest and intelligent, who have heard the same evidence with equal desire to arrive at the truth, and are under the same—are under the sanction of the same oath.

"The minority ought seriously to ask themselves whether they may not reasonably doubt the conclusion

---

[14] We note that the trial court included the alternative instruction in the same charge to the jury.

of a judgment that is not concurred in by most of those with whom they are associated and distrust the weight or sufficiency of that evidence that fails to carry in the minds of their fellow jurors.

"And it ends up with this sentence. I'm going to ask you to go back to the jury room and discuss the matter further." Later that same day, the jury returned a verdict, finding the defendant guilty of murder.

A

At the outset, we address the state's argument that the defendant failed to preserve his claim[15] at trial. The state contends that this court should decline to review the defendant's claim because the defendant failed to apprise the trial court of the specific grounds on which he had relied in objecting to the court's decision to give the Chip Smith charge. See Practice Book § 16-20. See generally *State* v. *Pinnock*, 220 Conn. 765, 795–96, 601 A.2d 521 (1992) (court declined to review claim on appeal in view of defendant's general objection to Chip Smith instruction, which had been made without reference to specific reasons on which objection was premised). We address the defendant's unpreserved claim, however, because the defendant has sought review pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).

"[A] defendant can prevail on [an unpreserved] claim of constitutional error . . . only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly

---

[15] Although the defendant relies on multiple provisions in both the federal and state constitutions in challenging the propriety of the trial court's Chip Smith instruction and, thus, has raised more than one claim on appeal, we collectively refer to those constitutional claims as the defendant's "claim" for ease of reference.

exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis in original.) Id., 239–40.

The defendant's claim is reviewable inasmuch as it satisfies the first two prongs of *Golding.* The record is adequate for our review, and, with respect to the second prong of *Golding,* the defendant's claim that the Chip Smith instruction coerced minority view members of the jury is of constitutional magnitude. The defendant cannot prevail on his claim, however, because he cannot satisfy the third prong of *Golding*: the alleged constitutional violations do not exist and did not deprive the defendant of a fair trial.

Since 1881, when we first considered this type of charge in *State* v. *Smith,* 49 Conn. 376, 386 (1881), we consistently have upheld the Chip Smith charge as "an acceptable method of assisting the jury to achieve unanimity." *State* v. *Wooten,* 227 Conn. 677, 707, 631 A.2d 271 (1993); see, e.g., *State* v. *Smith,* 222 Conn. 1, 22–23, 608 A.2d 63, cert. denied, 506 U.S. 942, 113 S. Ct. 383, 121 L. Ed. 2d 293 (1992); *State* v. *Pinnock,* supra, 220 Conn. 795; *State* v. *Ryerson,* 201 Conn. 333, 349, 514 A.2d 337 (1986); *State* v. *Avcollie,* 188 Conn. 626, 641, 453 A.2d 418 (1982), cert. denied, 461 U.S. 928, 103 S. Ct. 2088, 77 L. Ed. 2d 299 (1983); *State* v. *Wyman,* 118 Conn. 501, 507, 173 A. 155 (1934); see also *State* v. *Mosca,* 90 Conn. 381, 385, 97 A. 340 (1916) (Chip Smith instruction "has been . . . repeatedly given by trial courts and approved by this court as a proper instruction in cases where a failure to agree has been reported

by juries"). "The purpose of the instruction is to prevent a hung jury by urging the jurors to attempt to reach agreement. It is a settled part of Connecticut jurisprudence . . . . D. Borden & L. Orland, 5 Connecticut Practice Series: Connecticut Criminal Jury Instructions (2d Ed. 1997) § 4.4, p. 245. Better than any other statement . . . it makes clear the necessity, on the one hand, of unanimity among the jurors in any verdict, and on the other hand the duty of careful consideration by each juror of the views and opinions of each of his fellow jurors . . . ." (Internal quotation marks omitted.) *State* v. *Feliciano*, 256 Conn. 429, 439, 778 A.2d 812 (2001).

We most recently reaffirmed "the fundamental logic underlying the Chip Smith instruction" in *State* v. *Feliciano*, supra, 256 Conn. 443. In *Feliciano*, the trial court gave the jury instructions that were identical in all material respects to the instructions that the trial court delivered in the present case.[16] See id., 434–35, 437–38. Those

---

[16] The trial court in *Feliciano* delivered two full Chip Smith instructions over the course of the jury's deliberations. In its first full instruction to the jury, the trial court stated in relevant part: "If much [of] the larger number of the panel are for a particular verdict, a dissenting juror should consider why his or her own conclusion is one that makes no impression upon the minds of the others who are equally honest and intelligent, who have heard the same evidence, what the equalizers are to arrive at the truth, and are under the sanction of the same oath. The minority are seriously to ask themselves whether they may not reasonably doubt the conclusion of a judgment that is not concurred in by most of those with whom they are associated and distrust the weight or sufficiency of that evidence that fails to carry in the minds of their fellow jurors." (Internal quotation marks omitted.) *State* v. *Feliciano*, supra, 256 Conn. 435.

Later, the trial court delivered a second full Chip Smith instruction, stating in relevant part: "If much [of] the large number of the panel are for a particular verdict, a dissenting juror should consider why his or her own conclusion is one that makes no impression upon the minds of others, who are equally honest and intelligent, who have heard the same evidence with the equal desire to arrive at the truth and are under the sanction of the same oath. The minority ought seriously to ask themselves whether they may not reasonably doubt the conclusion of a judgment that is not concurred in by most of those with whom they are associated and distrust the weight

instructions included language urging minority view jurors to reconsider their conclusion in light of the conclusion reached by majority view jurors, the precise language upon which the defendant's claim of jury coercion wholly rests. We concluded in *Feliciano* that "[i]t is the language used and not the number of times a Chip Smith charge is given that determines whether the instruction is improper. If the words are not coercive, then the fact that they are uttered more than once does not change their character. In [*Feliciano*], the language was essentially the standard language approved [by this court] time and time again. The first part of the instructions contained the admonition that the trial court was not compelling the jury to reach a verdict ('under no circumstance [is the court] compelling you . . . these additional instructions are not to be construed . . . to be coercive . . . or to compel you to arrive at a verdict or to compel any of you to change your position'). The second half of the instructions merely explicated the deliberative process to the jury ('[P]ay proper respect to each other's opinions and listen with candor to each other's arguments. . . . [A] dissenting juror should consider why his or her own conclusion . . . makes no impression upon the minds of the others . . . . [T]he minority ought seriously to ask themselves whether they may not reasonably doubt the conclusion of a judgment that is not concurred in by most of those with whom they are associated . . . .').

"By asking the jurors to consider the views and arguments of others, the court's instructions [in *Feliciano*] embodied the very essence of the jury system, which is 'to secure unanimity by a comparison of views, and by arguments among the jurors themselves.' . . . *Lowenfield* v. *Phelps*, 484 U.S. 231, 237, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988). It would defy logic to suggest

or sufficiency of that evidence that fails to carry in the minds of the fellow jurors." (Internal quotation marks omitted.) Id., 438.

that a juror should not listen with deference to the views of others, particularly when a majority of the others holds a different view of the case than his own. No juror should possess the blind determination that the verdict shall represent his opinion, deaf to those whose equal intelligence and integrity have brought them to a different place. See id. The charge in [*Feliciano*], when read as a whole, properly informed the jury that each member had the individual responsibility to consider the opinion of the others *and* to satisfy him or herself of the correctness of his or her opinion and not merely to acquiesce in the conclusion of others." (Emphasis in original.) *State* v. *Feliciano*, supra, 256 Conn. 441–42.

Turning to the present case, we conclude that the trial court properly utilized the Chip Smith charge in instructing the jury. The instruction given in the present case differed in no substantive way from other Chip Smith instructions that we previously have upheld. See, e.g., id., 434–35, 437–38. Moreover, when read as a whole; e.g., *State* v. *Scott*, 256 Conn. 517, 527, 779 A.2d 702 (2001) ("a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts" [internal quotation marks omitted]); the trial court's instruction struck a fair balance between aiding the jury in the deliberative process and reminding jurors not to surrender their conscientiously held beliefs. The trial court repeatedly stated that the additional instructions were being given to facilitate the deliberative process. Specifically, the trial court stated: "The instructions are designed to aid you in considering your own positions individually and weighing your individual positions against the collective positions or the position of other members of the jury . . . .

"[Y]ou should consider the question you have to decide not only carefully, but also with due regard and deference to the opinions of each other.

"In conferring together, you ought to pay proper respect to each other's opinions and listen with an open mind to each other's arguments. . . .

* * *

"I have stated this to you in order to get you to further consider in your deliberations the opinions of your fellow jurors. . . .

* * *

"[Y]ou should, in conferring together, pay proper respect to each other's opinions with candor to each other's arguments."

At the same time, the trial court repeatedly reminded jurors that the instructions were not intended to coerce them into reaching a verdict and that their decision must be their own: "[T]he additional instructions are not to be construed by you to be coercive in any manner or to compel you to arrive at a verdict. . . . [They are] not to suggest to you in any manner that you are compelled to reach a verdict or must reach a verdict.

"The instructions that I shall give you now [are] only to provide you with additional information so that you may return to your deliberations and see whether you can arrive at a verdict."

Thus, notwithstanding the language used by the trial court to instruct minority view jurors to reconsider their position in light of the position of majority view jurors, we do not consider the instruction, when read as a whole, unduly coercive. We conclude that the defendant has failed to satisfy the third prong of *Golding* and, consequently, cannot prevail on his claim.

B

The defendant nevertheless maintains that we should overrule our earlier decisions and abandon the use of

the Chip Smith charge or, at least, the language urging minority view jurors to reconsider their conclusions. The defendant claims that the majority of the federal Circuit Courts of Appeals have concluded that such language is unduly coercive upon minority view jurors. A closer examination of the federal courts' jurisprudence reveals, however, that, in many cases, the courts have approved antideadlock instructions substantially similar to the trial court's instruction in the present case.

We initially note that the language of the Chip Smith instruction, as presently given by the trial courts of this state, is substantially similar to the language of the antideadlock charge approved by the United States Supreme Court for use in the federal courts. In *Allen* v. *United States*, 164 U.S. 492, 501–502, 17 S. Ct. 154, 41 L. Ed. 528 (1896), the United States Supreme Court approved the use of an antideadlock instruction[17] substantially similar to the instruction at issue in the present case. The court reasoned that "[w]hile, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury-room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury

[17] The federal equivalent of this state's Chip Smith instruction is the *Allen* charge, "[t]he purpose of [which] is to encourage unanimity (without infringement upon the conscientious views of each individual juror) by urging each juror to review and reconsider the evidence in the light of the views expressed by other jurors, in a manner evincing a conscientious search for truth rather than a dogged determination to have one's own way in the outcome of the deliberative process. In short, the substance of the *Allen* charge is the salutary admonition of Oliver Cromwell: 'I beseech you in the bowles [bowels] of Christ, think it possible you may be mistaken.' " *United States* v. *Smith*, 857 F.2d 682, 683–84 (10th Cir. 1988).

taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury-room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself." Id. In *Lowenfield* v. *Phelps*, supra, 484 U.S. 231, the court confirmed that "[t]he continuing validity of [its] observations in *Allen* [were] beyond dispute . . . ."[18] Id., 237. Moreover, "[d]espite a century of scrutiny and almost constant criticism of the [*Allen* charge], the [United States Supreme] Court has never withdrawn its approval of the . . . charge, although it has permitted each court of appeals to exercise its supervisory powers in fashioning its own version of the [charge]." 1 L. Sand et al., Modern Federal Jury Instructions (2001) p. 9-37. See generally *United States* v. *McElhiney*, 275 F.3d 928, 935–39 (10th Cir. 2001) (discussing history of *Allen* charge and relevant decisional law); 2A C. Wright, Federal Practice and Procedure (3d Ed. 2000) § 502, pp. 532–44 (discussing criticism of *Allen* charge and treatment of charge by federal courts of appeals). "[F]ederal courts have been reluctant to hold that the *Allen* charge—at least in its pure form—is impermissibly coercive and therefore a violation of due process." *United States* v. *McElhiney*, supra, 938; see also 2A C. Wright, supra, § 502, p. 540 ("[n]o [federal] court has held it unconstitutional to give [an *Allen*] charge, and many [federal] courts, even while voicing doubts about the *Allen* charge, hold that it is not error to give it"). Thus, since the United States Supreme Court's release of its decision in *Allen*, "[a]ll of the [f]ederal Courts of

---

[18] In *Lowenfield*, the petitioner sought a writ of habeas corpus in federal court challenging the propriety of an antideadlock instruction administered in a Louisiana trial court. See *Lowenfield* v. *Phelps*, supra, 484 U.S. 237. We note that the antideadlock instruction at issue in *Lowenfield* did not "speak specifically to the minority jurors"; id., 238; unlike the Chip Smith charge given by the trial court in the present case.

Appeals have upheld some form of a[n] [*Allen*] jury charge." *Lowenfield* v. *Phelps*, supra, 238 n.1.

A close analysis of federal case law reveals a diversity of permissible antideadlock instructions.[19] Federal case

---

[19] A review of decisions from our sister states reveals a similar pattern. See generally annot., 97 A.L.R.3d 96 (1980 & Sup. 2001) (surveying cases addressing use of antideadlock instructions in state courts). While at least one state court prohibits the use of antideadlock instructions; see *Foster* v. *State*, 698 N.E.2d 1166, 1170 n.10 (Ind. 1998) (when jury is deadlocked, proper procedure for trial court to follow is to reread instructions given to jury prior to deliberations without any further comment), citing *Lewis* v. *State*, 424 N.E.2d 107, 111 (Ind. 1981); other state courts continue to approve the use of either the original *Allen* charge or a modified version thereof. See, e.g., *Miller* v. *State*, 645 So. 2d 363, 365–66 (Ala. Crim. App. 1994); *Desmond* v. *State*, 654 A.2d 821, 827 (Del. 1993); *McMillan* v. *State*, 253 Ga. 520, 523, 322 S.E.2d 278 (1984). The Supreme Judicial Court of Massachusetts recommends that the trial courts of Massachusetts follow either a modified version of the *Allen* charge, known as a *Tuey* charge, or an antideadlock instruction based on what is now standard 15-4.4 of the American Bar Association's Standards for Criminal Justice (ABA standard). *Commonwealth* v. *Rodriquez*, 364 Mass. 87, 98–101, 300 N.E.2d 192 (1973); see 3 A.B.A., Standards for Criminal Justice (2d Ed. 1980) c. 15, standard 15-4.4, p. 15-133; A.B.A., Standards Relating to Trial by Jury (1968) § 5.4, pp. 145–46 (approved draft) (predecessor to standard 15-4.4 of Standards for Criminal Justice that court in *Rodriquez* cited with approval); cf. *Commonwealth* v. *Mitchell*, 943 S.W.2d 625, 626–28 (Ky. 1997) (recommending use of instruction based on ABA standard, but upholding instruction directing jury to return verdict); *State* v. *Nicholson*, 315 So. 2d 639, 641 (La. 1975) (prohibiting use of *Allen* charge or "any coercive modification thereof"). But cf. *State* v. *Wilson*, 806 So. 2d 854, 859–61 (La. App. 2001) (instruction encouraging jurors to reach verdict in light of expenses being incurred upheld as noncoercive). Many other state appellate courts, however, either recommend or require that the trial courts of their respective states use instructions patterned after the ABA standard. See, e.g., *Fields* v. *State*, 487 P.2d 831, 842 (Alaska 1971) (citing § 5.4 of the Standards Relating to Trial by Jury [hereinafter predecessor to ABA standard]); *People* v. *Gainer*, 19 Cal. 3d 835, 856 and n.21, 566 P.2d 997, 139 Cal. Rptr. 861 (1977) (citing predecessor to ABA standard); *Allen* v. *People*, 660 P.2d 896, 898 (Colo. 1983); *State* v. *Clay*, 112 Idaho 261, 264–65 and n.1, 731 P.2d 804 (1987) (citing predecessor to ABA standard); *People* v. *Prim*, 53 Ill. 2d 62, 74–76, 289 N.E.2d 601 (1972), cert. denied, 412 U.S. 918, 93 S. Ct. 2731, 37 L. Ed. 2d 144 (1973) (citing predecessor to ABA standard); *State* v. *Campbell*, 294 N.W.2d 803, 812 (Iowa 1980) (citing predecessor to ABA standard); *State* v. *Weidul*, 628 A.2d 135, 136 (Me. 1993); *Goodmuth* v. *State*, 302 Md. 613, 621–22, 490 A.2d 682 (1985); *State* v. *Jordan*, 130 N.H. 48, 49–50, 534 A.2d 378 (1987); *State* v. *Czachor*, 82

law may be categorized into three groups: "(1) those [cases] that still permit a charge which directs the minority alone to reconsider their position; (2) those that require that a charge which directs the minority to reconsider their position also contain balancing language directing the majority to reconsider their position as well; and (3) those that have banned any reference to the majority or minority." 1 L. Sand et al., supra, p. 9-43. Furthermore, those federal cases that sanction the use of an antideadlock charge urging minority view jurors to reconsider their position often permit district court judges to deliver other instructions that include language directing both majority and minority view jurors to reconsider their respective positions or that exclude any reference to majority and minority view jurors. Id.

The Courts of Appeals for the Second, Fifth, Ninth, Tenth and Eleventh Circuits permit the district courts within their respective jurisdictions to deliver an anti-deadlock charge urging minority view jurors to reconsider their conclusions.[20] See, e.g., *Vichare* v. *AMBAC*,

---

N.J. 392, 405, 407, 413 A.2d 593 (1980) (citing predecessor to ABA standard). Florida courts stand alone in *recommending* an antideadlock charge that resembles neither an instruction based on the ABA standard nor a modified version of the original *Allen* charge. See, e.g., *Roma* v. *State*, 785 So. 2d 1269, 1271 (Fla. App. 2001); cf. id., 1272–73 (upholding use of modified *Allen* charge).

[20] For example, the Eleventh Circuit pattern antideadlock instruction provides in relevant part: "If a substantial majority of your number are in favor of a conviction, those of you who disagree should reconsider whether your doubt is a reasonable one since it appears to make no effective impression upon the minds of the others. On the other hand, if a majority or even a lesser number of you are in favor of an acquittal, the rest of you should ask yourselves again, and most thoughtfully, whether you should accept the weight and sufficiency of evidence which fails to convince your fellow jurors beyond a reasonable doubt. . . ." Eleventh Circuit Pattern Jury Instructions, Criminal (West 1997) p. 434.

Although the Fifth and Ninth Circuit Courts of Appeals permit district courts within their respective jurisdictions to give an *Allen* instruction in its original form; see *Allen* v. *United States*, supra, 164 U.S. 501–502; certain committees associated with the Fifth and Ninth Circuit Courts of Appeals

*Inc.*, 106 F.3d 457, 462 (2d Cir. 1996); *United States* v. *Melendez*, 60 F.3d 41, 51–52 (2d Cir.), cert. denied sub nom. *Rosario* v. *United States*, 516 U.S. 900, 116 S. Ct. 258, 133 L. Ed. 2d 182 (1995), cert. denied sub nom. *Rodriguez* v. *United States*, 516 U.S. 969, 116 S. Ct. 429, 133 L. Ed. 2d 345 (1995), vacated on other grounds sub nom. *Colon* v. *United States*, 516 U.S. 1105, 116 S. Ct. 900, 133 L. Ed. 2d 834 (1996), and cert. denied sub nom. *Sanchez* v. *United States*, 516 U.S. 1148, 116 S. Ct. 1020, 134 L. Ed. 2d 99 (1996); *United States* v. *Miller*, 478 F.2d 1315, 1320 (2d Cir.), cert. denied, 414 U.S. 851, 94 S. Ct. 144, 38 L. Ed. 2d 100 (1973); *United States* v. *Winters*, 105 F.3d 200, 203–204 (5th Cir. 1997); *United States* v. *Nguyen*, 28 F.3d 477, 484 and n.4 (5th Cir. 1994); *United States* v. *Kimmel*, 777 F.2d 290, 294–95 and n.4 (5th Cir. 1985), cert. denied, 476 U.S. 1104, 106 S. Ct. 1947, 90 L. Ed. 2d 357 (1986); *United States* v. *Wills*, 88 F.3d 704, 716–18 (9th Cir.), cert. denied, 519 U.S. 1000, 117 S. Ct. 499, 136 L. Ed. 2d 390 (1996); *United States* v. *Arney*, 248 F.3d 984, 987–90 and n.3 (10th Cir. 2001); *United States* v. *Reed*, 61 F.3d 803, 805 and n.5 (10th Cir. 1995); *United States* v. *Butler*, 904 F.2d 1482, 1487–88 (10th Cir. 1990); *United States* v. *Smith*, 857 F.2d 682, 684 (10th Cir. 1988); *United States* v. *Dick-*

recommend alternative language that urges minority *and* majority view jurors to reflect upon their respective conclusions in the event of a deadlock. The Committee on Pattern Jury Instructions of the Fifth Circuit District Judges Association has proposed the following language for district courts in the Fifth Circuit: "Those of you who believe that the government has proved the defendant guilty beyond a reasonable doubt should stop and ask yourselves if the evidence is really convincing enough, given that other members of the jury are not convinced. And those of you who believe that the government has not proved the defendant guilty beyond a reasonable doubt should stop and ask yourselves if the doubt you have is a reasonable one, given that other members of the jury do not share your doubt." Fifth Circuit Pattern Jury Instructions, Criminal (West 2001) instruction 1.45, p. 70; see also Ninth Circuit Manual of Model Jury Instructions, Criminal (West 2000) instruction 7.7, p. 116 ("[e]ach of you should ask yourself whether you should question the correctness of your present position") (language recommended by Ninth Circuit Jury Committee).

*erson,* 248 F.3d 1036, 1050 (11th Cir. 2001); *United States* v. *Trujillo,* 146 F.3d 838, 846 (11th Cir. 1998).

The Courts of Appeals for the First, Fourth, Sixth and Eighth Circuits sanction the use of a modified *Allen* charge that directs majority as well as minority view jurors to reconsider their respective positions.[21] See, e.g., *United States* v. *Hernandez-Albino,* 177 F.3d 33, 38 (1st Cir. 1999); *United States* v. *Paniagua-Ramos,* 135 F.3d 193, 197 (1st Cir. 1998); *Tucker* v. *Catoe,* 221 F.3d 600, 610 (4th Cir.), cert. denied, 531 U.S. 1054, 121 S. Ct. 661, 148 L. Ed. 2d 563 (2000); *United States* v. *Cropp,* 127 F.3d 354, 360 (4th Cir. 1997), cert. denied, 522 U.S. 1098, 118 S. Ct. 898, 139 L. Ed. 2d 883 (1998); *United States* v. *Burgos,* 55 F.3d 933, 936–38 (4th Cir. 1995); *United States* v. *Frost,* 125 F.3d 346, 374–75 and n.11 (6th Cir. 1997), cert. denied, 525 U.S. 810, 119 S. Ct. 40, 142 L. Ed. 2d 32 (1998); *United States* v. *Tines,* 70 F.3d 891, 896 (6th Cir. 1995), cert. denied, 516 U.S. 1180, 116 S. Ct. 1280, 134 L. Ed. 2d 225 (1996); *United States* v. *Robinson,* 953 F.2d 433, 436 (8th Cir. 1992); *Potter* v. *United States,* 691 F.2d 1275, 1279–80 (8th Cir. 1982); *United States* v. *Smith,* 635 F.2d 716, 720–21 and n.7 (8th Cir. 1980).

The Courts of Appeals for the Third, Seventh and the District of Columbia Circuits are the only federal appellate courts that prohibit instructions directing minority view jurors to reconsider their position in light of the position of the majority view jurors. See, e.g., *United States* v. *Eastern Medical Billing, Inc.,* 230 F.3d 600, 607–10 (3d Cir. 2000); *United States* v. *Graham,*

---

[21] For example, the First Circuit pattern antideadlock instruction provides in relevant part: "Not only should jurors in the minority re-examine their positions, but jurors in the majority should do so also, to see whether they have given careful consideration and sufficient weight to the evidence that has favorably impressed the persons in disagreement with them. . . ." First Circuit Pattern Jury Instructions, Criminal (West 1998) instruction 6.06, p. 136.

758 F.2d 879, 883 (3d Cir.), cert. denied, 474 U.S. 901, 106 S. Ct. 227, 88 L. Ed. 2d 227 (1985); *United States* v. *Fioravanti,* 412 F.2d 407, 420 (3d Cir.), cert. denied sub nom. *Panaccione* v. *United States,* 396 U.S. 837, 90 S. Ct. 97, 24 L. Ed. 2d 88 (1969); *United States* v. *Sblendorio,* 830 F.2d 1382, 1386–87 (7th Cir. 1987), cert. denied, 484 U.S. 1068, 108 S. Ct. 1034, 98 L. Ed. 2d 998 (1988); *United States* v. *Silvern,* 484 F.2d 879, 883 (7th Cir. 1973); *United States* v. *Strothers,* 77 F.3d 1389, 1391 (D.C. Cir.), cert. denied, 519 U.S. 956, 117 S. Ct. 374, 136 L. Ed. 2d 263 (1996); *United States* v. *Dorsey,* 865 F.2d 1275, 1277–78 (D.C. Cir.), cert. denied, 492 U.S. 924, 109 S. Ct. 3257, 106 L. Ed. 2d 603 (1989); *United States* v. *Thomas,* 449 F.2d 1177, 1187 and n.71 (D.C. Cir. 1971). Indeed, these three circuits prohibit any and all references to minority or majority view jurors. In modifying the original *Allen* charge, each of these three circuits, like other circuits, have acted pursuant to their respective supervisory authority over the district courts; e.g., *United States* v. *Silvern,* supra, 882 ("in the interest of judicial economy and uniformity, and under our supervisory power, district courts in this circuit are henceforth required to [comply with the American Bar Association standards[22] in giving an anti-

---

[22] The Seventh Circuit Court of Appeals refers to § 5.4 of the American Bar Association's Standards Relating to Trial by Jury; see footnote 19 of this opinion; which provides in relevant part: "(a) Before the jury retires for deliberation, the court may give an instruction which informs the jury:

"(i) that in order to return a verdict, each juror must agree thereto;

"(ii) that jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

"(iii) that each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

"(iv) that in the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

"(v) that no juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict. . . ." A.B.A., Standards Relating to Trial by Jury (1968) § 5.4, pp. 145–46 (approved draft). In 1980,

deadlock instruction]"); *Government of the Virgin Islands* v. *Hernandez*, 476 F.2d 791, 792 (3d Cir. 1973) ("[r]ecognizing the inherent potential of the charge to coerce and the inscrutable problem of determining in each case whether such coercion actually existed, we prospectively banned the use of the *Allen* [c]harge in this circuit . . . as part of our supervisory authority over the district courts" [citation omitted]); *United States* v. *Thomas*, supra, 1187 ("in the exercise of our supervisory power over the administration of the law in this circuit, we adopt the [American Bar Association] standard[23] for the guidelines [by] which future renditions of *Allen*-type charges must abide, and the [American Bar Association] approved instruction[24] as the

---

the American Bar Association incorporated the foregoing standards, save some minor stylistic changes, into standard 15-4.4 of its Standards of Criminal Justice. See 3 A.B.A., Standards for Criminal Justice (2d Ed. 1980) c. 15, standard 15-4.4, p. 15-133.

In its commentary to § 5.4 of the Standards Relating to Trial by Jury, the American Bar Association identifies the following illustrative example of an antideadlock instruction that incorporates the foregoing standards: "The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

"It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

"You are not partisans. You are judges—judges of the facts. Your sole interest is to ascertain the truth from the evidence in the case." (Internal quotation marks omitted.) A.B.A., Standards Relating to Trial by Jury, supra, pp. 146–47 (commentary to § 5.4 [a]); accord 3 A.B.A., Standards for Criminal Justice, supra, p. 15-134 (commentary to standard 15-4.4 [a]); see also Seventh Circuit Federal Jury Instructions, Criminal (West 1999) instruction 7.06, p. 116 (instruction substantially similar to American Bar Association example).

[23] See footnote 22 of this opinion.

[24] See footnote 22 of this opinion.

vehicle for informing jurors of their responsibilities in situations wherein judges decide to do so"); and not because they have held that an antideadlock charge containing references to minority or majority view jurors is per se unconstitutional. See, e.g., *United States* v. *Silvern,* supra, 880 ("no court has held that the [*Allen*] instruction itself is unconstitutional"). As the District of Columbia Circuit Court of Appeals has explained, the decisions of the Third, Seventh and District of Columbia Circuit Courts of Appeals were motivated in large part by the view that continued reference to majority and minority view jurors in antideadlock instructions was "an invitation for perennial appellate review"; (internal quotation marks omitted) *United States* v. *Thomas,* supra, 1185, quoting *United States* v. *Fioravanti,* supra, 420; and by the administrative burdens that the original *Allen* charge and its variations engendered. *United States* v. *Thomas,* supra, 1185.

It also is important to note that shortly following the release of the Third, Seventh and District of Columbia Circuit decisions rejecting the use of the *Allen* charge,[25] "the debate over the [*Allen*] charge's validity tapered off dramatically, leaving for the federal courts the framework discussed above: in some courts, the pure charge still persists, though certain modified forms [are] recommended instead because of their inclusion of cautionary language, while, in other courts, the *Allen*

[25] Decisions of the Third, Seventh and District of Columbia Circuit Courts of Appeals to abandon the *Allen* charge in favor of an antideadlock instruction that adheres to the standards approved by the American Bar Association; see 3 A.B.A., Standards for Criminal Justice (2d Ed. 1980) c. 15, standard 15-4.4, p. 15-133; A.B.A., Standards Relating to Trial by Jury (1968) § 5.4 (a), p. 145 (approved draft); all predate *Lowenfield* v. *Phelps,* supra, 484 U.S. 237–38, in which the United States Supreme Court reaffirmed its reasoning in *Allen* v. *United States,* supra, 164 U.S. 501–502. See *United States* v. *Thomas,* supra, 449 F.2d 1187; *United States* v. *Fioravanti,* supra, 412 F.2d 420 n.32; *United States* v. *Brown,* 411 F.2d 930, 933–34 (7th Cir. 1969), cert. denied, 396 U.S. 1017, 90 S. Ct. 578, 24 L. Ed. 2d 508 (1970).

charge has been formally replaced by a substitute charge, also containing cautionary language to ward off the potential for coercion. The [United States] Supreme Court, surveying the [state of the law] in the late 1980s, commented that, in spite of all the past controversy over the *Allen* instruction, '[a]ll of the [f]ederal [Circuit] Courts of Appeals have upheld *some* form of [such] a charge.' *Lowenfield* [v. *Phelps*, supra, 484 U.S. 238 n.1] . . . . Or, as the Fourth Circuit put it, 'not a single one of the [circuit courts of appeals] has outlawed . . . instructions to juries for the purpose of inducing further deliberation and agreement upon a verdict.' *United States* v. *Sawyers*, 423 F.2d 1335, 1343 (4th Cir. 1970). This fact remains true today." (Emphasis in original.) *United States* v. *McElhiney*, supra, 275 F.3d 939; cf. annot., 97 A.L.R.3d 96 (1980 & Sup. 2001) (discussing similarly divergent treatment of antideadlock instructions among state courts).

As the foregoing summary indicates, the delivery of an antideadlock instruction that urges minority view jurors to think again about the views of majority view jurors generally constitutes an acceptable method of encouraging a deadlocked jury to reach unanimity, especially when the instruction is balanced with cautionary language directing jurors not to abandon their conscientiously held views. See *Smalls* v. *Batista*, 191 F.3d 272, 283 (2d Cir. 1999) ("[w]hile a proper charge can encourage dialogue and debate and inform jurors that they may attempt to convince others that a particular view is correct, such a charge must caution the jurors never to abandon their conscientiously held beliefs, even if holding firm will result in a deadlock"). After carefully considering the widely divergent treatment of antideadlock instructions by the federal courts and the courts of other states,[26] we reaffirm the use of the Chip Smith charge as an acceptable method of

---

[26] See footnote 19 of this opinion.

encouraging jury unanimity. We do so because, in our view, the charge strikes a fair balance between encouraging a jury to reach a unanimous verdict, an important public policy goal itself; see *State* v. *Feliciano*, supra, 256 Conn. 441–42 (Chip Smith instruction "embodie[s] the very essence of the jury system, which is to secure unanimity by a comparison of views, and by arguments among the jurors themselves" [internal quotation marks omitted]); and protecting the criminal defendant's due process rights. See *Smalls* v. *Batista*, supra, 279 (cautionary language directing jurors not to surrender conscientiously held beliefs is "necessary component" of any antideadlock instruction). We, therefore, conclude that the defendant has failed to present "the most cogent reasons and inescapable logic"; (internal quotation marks omitted) *State* v. *Alvarez*, 257 Conn. 782, 794, 778 A.2d 938 (2001); for overruling our prior case law dealing with the Chip Smith charge.

C

Although we affirm the validity of the Chip Smith charge, we reiterate that, in giving the charge, jurors should be reminded not to acquiesce in the conclusion of their fellow jurors merely for the sake of arriving at a unanimous verdict. Accordingly, in the exercise of our supervisory authority over the administration of justice; see, e.g., *State* v. *Aponte*, 259 Conn. 512, 522, 790 A.2d 457 (2002); *Roth* v. *Weston*, 259 Conn. 202, 231, 789 A.2d 431 (2002); we adopt the following version of the Chip Smith instruction for use by our trial courts in future cases:

*The instructions that I shall give you now are only to provide you with additional information so that you may return to your deliberations and see whether you can arrive at a verdict.*

*Along these lines, I would like to state the following to you. The verdict to which each of you agrees must*

*express your own conclusion and not merely the acquiescence in the conclusion of your fellow jurors. Yet, in order to bring your minds to a unanimous result, you should consider the question you have to decide not only carefully but also with due regard and deference to the opinions of each other.*

*In conferring together, you ought to pay proper respect to each other's opinions and listen with an open mind to each other's arguments. If the much greater number of you reach a certain conclusion, dissenting jurors should consider whether their opinion is a reasonable one when the evidence does not lend itself to a similar result in the minds of so many of you who are equally honest and equally intelligent, who have heard the same evidence with an equal desire to arrive at the truth and under the sanctions of the same oath.*

*But please remember this. Do not ever change your mind just because other jurors see things differently or to get the case over with. As I told you before, in the end, your vote must be exactly that—your own vote. As important as it is for you to reach a unanimous agreement, it is just as important that you do so honestly and in good conscience.*

*What I have said to you is not intended to rush you into agreeing on a verdict. Take as much time as you need to discuss the matter. There is no need to hurry.*

In summary, we affirm the validity of the Chip Smith charge as an acceptable method of encouraging a deadlocked jury to reach a verdict. Notwithstanding those federal and state court decisions to the contrary, we do not find the language directed at minority view jurors unduly coercive, especially in light of the balancing language reminding jurors not to abandon their conscientiously held beliefs. On the contrary, we believe that the version of the charge that we adopt today for our

trial courts most appropriately balances the systemic interest in a unanimous verdict and the defendant's right to have each and every juror vote his or her conscience irrespective of whether such vote results in a hung jury. We conclude that the trial court properly delivered a Chip Smith instruction in the present case.

## II

The defendant next claims that the trial court improperly admitted into evidence information regarding two unrelated criminal matters that were pending at the time of his trial. Specifically, the defendant argues that the trial court abused its discretion in allowing one of the state's witnesses to testify about the two unrelated criminal matters[27] and by admitting into evidence a portion of a coded letter, which the defendant had written, discussing those matters. We conclude that the trial court did not abuse its discretion.

The following additional facts and procedural history are relevant to our resolution of the defendant's claim. While incarcerated and awaiting his first trial on the murder charge,[28] the defendant authored a letter written in code,[29] in which he instructed an individual named "Wayne" to kill Smalls, the state's key witness. The letter, which was intercepted by correction officials

---

[27] The record does not disclose fully the nature of the pending criminal matters, one of which resulted from an incident that occurred on June 25, 1993, and another that occurred at Nanny Goat Park (now known as Washington Park) in Bridgeport.

[28] As we noted previously in this opinion, the defendant's first trial on the murder charge resulted in a mistrial.

[29] In writing the coded letter, the defendant used a simple substitution system in which symbols represented the placement of particular letters of the alphabet in a series of tic-tac-toe and X grids. Cryptanalysts, who are specialists in deciphering communications in secret code or "cryptograms," call such substitution codes "pigpen cipher."

and later decoded,[30] also included instructions for an individual named Pintchers to establish an alibi for the defendant for the night of June 25, 1993,[31] and discussed how the defendant personally could deal with another matter relating to an incident at Nanny Goat Park (now known as Washington Park) in Bridgeport.[32]

The defendant sought to preclude the state from eliciting testimony concerning the two criminal matters that were pending against the defendant on April 24, 1997, the date on which a probable cause hearing was scheduled in the defendant's first trial, and sought to preclude the state from introducing into evidence the defendant's letter, the second paragraph of which also referred to those matters. The state contended that the information was relevant for purposes of establishing the identity of the letter writer, namely, the defendant, and the defendant's consciousness of guilt.

The trial court ruled that the state could elicit testimony concerning the existence of the two unrelated criminal matters pending against the defendant. Thereafter, the state called John Blawie, an assistant state's attorney who had been assigned to prosecute the defendant in the first trial. Blawie testified that, before the scheduled probable cause hearing on April 24, 1997, he had delivered to the defendant's former attorney a disclosure packet that included Smalls' written statement identifying the defendant as the individual who shot the victim. Blawie further testified that, on the same day that he delivered the disclosure packet, the defendant waived his right to the probable cause hearing. Blawie testified that, in light of the defendant's

---

[30] Michael Birch, a cryptanalyst with the Federal Bureau of Investigation, first uncovered the code by arbitrarily placing letters in tic-tac-toe and X grids. He then decoded the letter by comparing the symbols used in the letter with the letters assigned to the particular spaces within the grids.

[31] See footnote 27 of this opinion.

[32] See footnote 27 of this opinion.

waiver, the state would not have been permitted to introduce Smalls' statement into evidence if Smalls subsequently had become unavailable to testify at the defendant's trial because Smalls would not have been subject to cross-examination. See, e.g., *State* v. *Outlaw*, 216 Conn. 492, 497–98, 582 A.2d 751 (1990). Blawie acknowledged that the state would not have continued its prosecution of the defendant in the absence of Smalls' testimony. Blawie then testified that the defendant had two other matters pending against him on April 24, 1997, one relating to the June 25, 1993 incident and the other relating to the Nanny Goat Park incident.

The trial court thereafter instructed the jury that, although the relevance of Blawie's testimony concerning the two pending criminal matters was not immediately apparent, it would become more apparent as the trial progressed. The trial court further instructed the jury not to speculate as to "what [the defendant] was charged with" in connection with the pending matters and that any charges brought in connection with those matters were irrelevant to the jury's task in the present case. The court emphasized that "those two other cases [were] not evidence that [the defendant] is a bad person likely to commit crimes" and that the jury could not use Blawie's testimony about the pending matters as evidence that the defendant was "a bad person with a propensity to commit crimes."

Later in the trial, the state offered the coded letter as a full exhibit, to which the defendant objected. The defendant specifically objected to the introduction of the second paragraph of the letter,[33] which refers to the

---

[33] The decryption of the second paragraph of the letter in unedited form provides in relevant part: "And I need you to get this message to Pintchers. That he seen me at the After Hours on Holister Ave on the twentie fifth of June. And the reason why he can remember is because on that night everybody was talking about the Dougie-Fresh Show at In Living Color. And that he seen me at about ane twentie five—one thertie a.m. and that we was there talking and I was kinda tipsy. After. A while. And he took me home about three forty five a.m. about qomething to to four o-clock a.m. and he

June 25, 1993 and Nanny Goat Park incidents, on the ground that the paragraph tended to support an inference that the defendant was manipulating the evidence. The defendant also claimed that the admission of the second paragraph of the letter into evidence would be "more prejudicial than probative," the second paragraph of the letter having been cumulative with respect to the issue of identity in light of the first paragraph, in which the defendant instructed "Wayne" to kill Smalls.[34] Conversely, the state contended that both of the paragraphs were "extremely relevant to show identity with regard to the authorship of the letter." The state further argued that the letter was admissible for substantive purposes as an admission of the defendant pursuant to *State* v. *Stepney*, 191 Conn. 233, 250–54, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984). The trial court overruled the defendant's objection and allowed the state to introduce the coded letter along with a decryption thereof through

was driving his brother car the green one. And Newten was on the passenger side in the front seat. And I was in the backseat behind the driver. And he sat in front of my house till I went threw the door. And thats my alliby. Tell them that's the lecst they can do for me. And thers no way the court can proove us rong. Because there witness are contridicting themself. Tell him I got the story down pack already. And to let you know what there going to do. . . . And this all took place in nineteen ninty three. And with these two out of the way, I only have one left the one in the vark. I cat deal with that by my self."

[34] The decryption of the first paragraph of the letter in unedited form provides: "I'm going to get straight to the point. I need you to take care of Pooch [Smalls' street name] and I mean immediately. He is the only and the key witness in one of my cases. Without him the case would be dismissed. Make sure youll gloved up, mask up and get rid of the John, peice for peice. And make sore yb'll alliby states that you'll were in New York at that pont and time. And youll make sure someoody in New York is saying youll was there with them. And make sure youll get the time schedule worked out between everybody. And how youll got to New York better to qay by car. Youll make qure youll have a driver and the color of the car. And everybody has to be saying the same thing exspecially you, the driver and the people in New York. And don't forget to workout the time that is a very important part of you guvse alliby. Once that all takitg cared of everbody will be alright."

the testimony of Michael Birch, a cryptanalyst with the Federal Bureau of Investigation. Birch explained the method he used to decode the letter and read the decoded letter to the jury.

Shortly thereafter, the trial court gave a limiting instruction to the jury. In its limiting instruction, the court explained that the state was offering the first paragraph, in which the author instructed the letter's recipient "to take care of" Smalls, solely for the purpose of establishing the defendant's consciousness of guilt. The court further explained that the state was offering the second paragraph solely for the purpose of establishing the identity of the author. The trial court further cautioned that those were the only two issues for which the jury could consider the contents of the letter. In its charge to the jury after the close of evidence, the court reiterated its instructions regarding the letter and Blawie's testimony about the June 25, 1993 and Nanny Goat Park incidents. As we noted previously in this opinion, the trial court also reinstructed the jury on how it could use the decoded letter in response to a note from the jury during its deliberations.

"As a general rule, evidence of a defendant's prior crimes or misconduct is not admissible." (Internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 396, 788 A.2d 1221 (2002). "The rationale of this rule is to guard against its use merely to show an evil disposition of an accused, and especially the predisposition to commit the crime with which he is now charged." (Internal quotation marks omitted.) *State* v. *Figueroa*, 235 Conn. 145, 161, 665 A.2d 63 (1995); see also *State* v. *George B.*, 258 Conn. 779, 790, 785 A.2d 573 (2001) ("such evidence [cannot] be used to suggest that the defendant has a bad character or a propensity for criminal behavior"). "[Prior misconduct] [e]vidence may be admissible, however, for other purposes, such as to prove knowledge, intent, motive, and common scheme

or design, if the trial court determines, in the exercise of judicial discretion, that the probative value of the evidence outweighs its prejudicial tendency." (Internal quotation marks omitted.) *State* v. *George B.*, supra, 790; see also *State* v. *Vega*, supra, 396 (prior misconduct evidence may be offered "to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime" [internal quotation marks omitted]).

"We have developed a two part test to determine the admissibility of such evidence. First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh [its] prejudicial effect . . . . Because of the difficulties inherent in this balancing process, the trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . On review by this court, therefore, every reasonable presumption should be given in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *State* v. *George B.*, supra, 258 Conn. 790–91; accord *State* v. *Vega*, supra, 259 Conn. 397.

As defense counsel conceded at trial, the first paragraph of the letter, in which the defendant instructed "Wayne" to kill Smalls, constituted strong inculpatory evidence. Nevertheless, for the state to demonstrate the defendant's consciousness of guilt, it had to demonstrate that the defendant authored the letter. Accordingly, the state introduced Blawie's testimony regarding the defendant's two pending criminal matters and also introduced the second paragraph of the letter, which refers to the incidents underlying those matters, namely, the June 25, 1993 and the Nanny Goat Park incidents. In introducing Blawie's testimony and the second paragraph of the letter, the state sought to support an inference that the defendant had authored the letter.

The record in the present case demonstrates that the trial court carefully weighed the probative value of the evidence of the pending criminal matters against its prejudicial effect and properly determined that any resulting prejudice did not outweigh the probative value of the evidence. Cf., e.g., *State* v. *Feliciano*, supra, 256 Conn. 454 ("[e]vidence is prejudicial when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence" [internal quotation marks omitted]). The state introduced evidence regarding the existence of the two pending criminal matters involving the defendant, to which the second paragraph of the letter had referred. This established that the defendant had authored the letter. By linking the defendant to the letter, the state established, by virtue of the first paragraph of the letter, that the defendant had attempted to solicit "Wayne" to kill Smalls, the state's key witness, and thereby inferentially established the defendant's consciousness of guilt. The references to the existence of the pending criminal matters did not include any information about the nature of the crimes underlying those pending matters. Moreover, the trial court instructed the jury not to speculate as to the nature of the charges brought in connection with the matters pending against the defendant and repeatedly emphasized the limited uses of the state's offer. The trial court also reinstructed the jury on the proper uses of the letter in response to the jury's note. Such limiting instructions serve to minimize any prejudicial effect that such evidence otherwise may have had. See, e.g., *State* v. *George B.*, supra, 258 Conn. 794; *State* v. *Kulmac*, 230 Conn. 43, 63, 644 A.2d 887 (1994). In the absence of evidence to the contrary, we presume that the jury properly followed those instructions. E.g., *State* v. *Taft*, 258 Conn. 412, 421, 781 A.2d 302 (2001). We, therefore, conclude that the trial court did not abuse its discretion in con-

cluding that the probative value of the evidence outweighed its prejudicial effect.

The judgment is affirmed.

In this opinion SULLIVAN, C. J., and KATZ and PALMER, Js., concurred.

BORDEN, J., with whom NORCOTT and VERTEFEUILLE, Js., join, concurring. I agree with the majority that our Chip Smith[1] jury instruction is not unduly coercive, and that the trial court's evidentiary ruling was proper. I also agree with the majority that the time has come for us, in the exercise of our supervisory power over the administration of criminal justice, to require that our trial courts in the future deliver a modified form of antideadlock instruction. I differ from the majority, however, in one respect: I would go one step further, and impose the same duty of redeliberation on both the majority and minority members of the jury. I would, therefore, adopt the instruction approved by the United States Court of Appeals for the Sixth Circuit, in *United States* v. *Frost*, 125 F.3d 346, 374 n.11 (6th Cir. 1997).[2]

---

[1] *State* v. *Smith*, 49 Conn. 376, 386 (1881).

[2] The instruction provides as follows: "I realize that you are having some difficulty in reaching unanimous agreement, but that is not unusual. And sometimes after further discussion, jurors are able to work out their differences and to agree.

"Please keep in mind how very important it is for you to reach unanimous agreement. If you cannot agree, and if this case is tried again, there is no reason to believe that any new evidence will be presented, or that the next [six or twelve, as the case may be] jurors will be any more conscientious and impartial than you are.

"Now, let me remind you that it is your duty as jurors to talk with each other about the case, to listen carefully and respectfully to each other's views, and to keep an open mind as you listen to what your fellow jurors have to say. And let me remind you that it is your duty to make every reasonable effort you can to reach unanimous agreement. Each of you, whether you are in the majority or the minority, ought to seriously reconsider your position in light of the fact that other jurors, who are just as conscientious and impartial as you are, have come to a different conclusion.

"Those of you who believe that the [state] has proved the defendant guilty beyond a reasonable doubt should stop and ask yourselves if the evidence is really convincing enough, given that other members of the jury are not

This charge eliminates any distinction, in terms of an obligation to rethink one's conclusions, between members of the majority and the minority of the jury—a distinction that the majority's formulation retains. Each of us on this court has been the beneficiary of a collective decision-making process in which, from time to time, the initial majority on a given case—even what may be regarded as the "much greater of" us—has been persuaded to change its mind by reconsidering its conclusions at the urging of the initial minority—even what may be regarded as the "much fewer of" us. I would require the trial court to afford the jury the same opportunity by reminding it that *both* sides—majority and minority—should listen to the views of the other and change their minds if persuaded to do so. The formulation that I offer does so, in contrast to that of the majority, which imposes such an obligation of rethinking its conclusions only when the "much greater number of you reach a certain conclusion"; in such a situation, under the majority's formulation, only the "dissenting jurors should consider whether their opinion is a reasonable one . . . ." I would impose the same obligation on both majority and minority jury members, irrespective of the size of each.

convinced. And those of you who believe that the [state] has not proven the defendant guilty beyond a reasonable doubt should stop and ask yourselves if the doubt you have is a reasonable one, given that other members of the jury do not share your doubt. None of you should hesitate to change your mind if, after reconsidering things, you are convinced that the other jurors are right and that your original position was wrong.

"But remember this. Do not ever change your mind just because other jurors see things differently, or just to get the case over with. As I told you before, in the end, your vote must be exactly that—your own vote. As important as it is for you to reach unanimous agreement, it is just as important that you do so honestly and in good conscience.

"What I have just said is not meant to rush or pressure you into agreeing on a verdict. Take as much time as you need to discuss things. There is no hurry.

"I would ask that you now return to the jury room to resume your deliberations." (Internal quotation marks omitted.) *United States* v. *Frost*, supra, 125 F.3d 374 n.11.

Furthermore, in contrast to our present Chip Smith charge, the majority's new formulation contains within it a seed of future ambiguity for jurors, namely, that the obligation of the members of the minority to rethink their position only comes into play when put next to a sort of supermajority, characterized by the description, the "much greater number of you." The current charge, to be sure, contains the same language, but it modifies that, at least implicitly, by then referring simply to "the majority" and "the minority." We can never know, of course, precisely how jurors talk to each other after hearing this charge, but it is reasonable to infer that at least some of a majority of one or two use the latter references to persuade a bare minority to yield to the views of a bare majority.

The new formulation, however, is predicated on a supermajority of the "much greater number." In a twelve member jury, is that eight to four, or must it be nine to three or ten to two, or eleven to one? In a six member jury, is it four to two, or must it be five to one? It is foreseeable that future jurors will argue among themselves, or perhaps request that the trial court provide clarification, regarding what numbers constitute the "much greater number." I see little virtue in planting such a seed of ambiguity.

Furthermore, what is the obligation of the jurors, if any, to attempt to avoid a deadlock when they are separated *only* by a bare majority and bare minority— for example seven to five in a murder case? The majority opinion's focus on the "much greater number" of them suggests that there is no such obligation. I see little virtue in leaving that likely situation unaddressed by an approved antideadlock instruction.

In sum, a simpler and fairer instruction would be in accordance with the language suggested by the Court

of Appeals in *United States* v. *Frost*, supra, 125 F.3d 374 n.11. I would, therefore, direct our trial courts accordingly.