******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* JAMES K.*
## (AC 42872)

Prescott, Moll and Suarez, Js.

*Syllabus*

Convicted of the crime of risk of injury to a child as a result of certain physical contact with his minor daughter, the defendant appealed to this court, claiming, inter alia, that the trial court violated his right to be tried before an impartial jury when it prohibited his counsel from asking prospective jurors during voir dire to express their opinions with respect to parents who kiss their children on the lips. When the state indicated it would seek to introduce into evidence a photograph of the defendant kissing the victim's half sister on the lips, defense counsel objected. The trial court first precluded defense counsel from asking prospective jurors about kissing on the lips because it was too specific to the facts of the case and limited defense counsel to asking prospective jurors about whether parents can have different methods of showing physical affection to their children. Thereafter, the court ruled the photograph inadmissible because it was prejudicial to the defendant. The defendant also had been charged with two counts of sexual assault in the first degree in connection with the incident with the victim. Although the jury initially had been unable to reach a unanimous verdict as to all three charges, the trial court delivered a "Chip Smith" instruction urging the jury to reach a verdict, after which it returned its verdict, which included a finding of not guilty as to the sexual assault charges. *Held*:

1. The trial court did not abuse its discretion when it prohibited defense counsel from asking prospective jurors to express their opinions with respect to parents who kiss their children on the lips: contrary to the defendant's assertion that the court improperly limited the scope of his voir dire because that issue was a central issue in the case and many people view it as inappropriate and offensive, the court's extremely narrow ruling was limited only to that question, it prevented counsel from improperly using voir dire to ascertain prospective jurors' opinions about evidence that would be presented at trial or implanting in their minds an opinion about that evidence, and, by permitting inquiry about the general topic of physical displays of affection, the court provided counsel wide latitude to determine whether prospective jurors had prejudices against parents kissing their children on the lips, and properly struck a balance between the competing considerations of protecting a party's inviolate right to ask questions to uncover prejudice and avoiding inquiries that touch on facts before the jury; moreover, after the court excluded the photograph from evidence, there was no photographic evidence of the defendant kissing any child on the lips, the subject of the defendant's kissing the victim on the lips did not form the factual basis of any of the offenses with which he was charged, and the prosecutor did not rely on the evidence of kissing in her closing argument to the jury; furthermore, the defendant failed to demonstrate that the court's ruling resulted in harmful prejudice, as the evidence of kissing played only a slight role in the trial and was not inherently prejudicial in nature, and the jury's split verdict, in which it found the defendant not guilty of the sexual assault charges, supported the conclusion that the court's limitation on voir dire did not result in a jury that was unable to carefully and fairly consider each of the charges and the evidence related thereto.

2. The defendant could not prevail on his claim that the trial court abused its discretion by admitting into evidence a videotaped forensic interview of the victim: rather than summarily rejecting the defendant's assertion that the video was unduly prejudicial and cumulative of the victim's testimony at trial, as the defendant claimed, the broad language of the court's ruling suggested that the court considered and rejected the grounds of objection the defendant raised, and the court explicitly stated that the video fell within the medical diagnosis and treatment exception to the rule against hearsay (§ 8-3 (5)), with which the defendant agreed;

moreover, the video was relevant and highly probative with respect to the defendant's conduct with the victim, the video was not admitted as constancy of accusation evidence, as the defendant contended, and it did not bolster the victim's credibility, as the interview was conducted by a clinical social worker, and the video did not contain the opinions of expert witnesses or statements of third parties; furthermore, the video was not unduly prejudicial, as it did not improperly emphasize the victim's testimony by permitting her to testify twice, it did not generate sympathy for her, as any expressions of empathy by the interviewer reflected her effort to build a rapport with the victim, and, although the victim's comments in the video were not identical to her trial testimony, the different language she used in the video was not so different in nature that it would likely engender strong feelings of sympathy over that which may have been engendered by her testimony at trial.

3. The defendant failed to establish that the trial court violated his rights to due process, to a fair and impartial trial, and to be convicted by means of a unanimous verdict when it declined to use language in his written request for instructions to urge the deadlocked jury to reach a verdict and, instead used model instructions from the Judicial Branch website: the defendant was not entitled to the instruction he proposed, which condoned a hung jury, nothing concerning the context or circumstances in which the court delivered the model instructions led to the conclusion that the instructions were coercive, as the fact that the jury had engaged in deliberations for three days and requested the playback of certain testimony and evidence prior to sending the court a note stating that it was deadlocked merely reflected, at most, that the jury was fulfilling its duty of carefully considering the evidence; moreover, the jurors' note and stated belief in that note that additional deliberation time would not be fruitful did not make the court's instructions coercive or give the unwarranted impression that a verdict was required, as the note did not refer to hostility among jurors or indicate they had not followed their oaths or would not continue to follow their oaths after additional instruction from the court.

4. This court declined to exercise its supervisory authority over the administration of justice to require trial courts to instruct deadlocked juries that they need not reach a verdict and that jurors have the right to disagree with respect to the proper verdict; because the Supreme Court has explicitly addressed the issue of what instructions are proper when a jury is deadlocked, it would be inappropriate for this court to overrule, reevaluate, or reexamine the propriety of the instructions.

Argued February 2—officially released December 28, 2021

*Procedural History*

Substitute information charging the defendant with two counts of the crime of sexual assault in the first degree and one count of the crime of risk of injury to a child, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *B. Fischer, J.*; thereafter, the court denied the defendant's motion to preclude certain evidence; verdict and judgment of guilty of risk of injury to a child, from which the defendant appealed to this court. *Affirmed.*

*Pamela S. Nagy*, Supervisory Assistant Public Defender, for the appellant (defendant).

*Samantha L. Oden*, former deputy assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Maxine V. Wilensky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SUAREZ, J. The defendant, James K., appeals from the judgment of conviction, rendered following a jury trial, of risk of injury to a child in violation of General Statutes § 53-21 (a) (2).[1] The defendant claims that (1) the trial court violated his right to a fair trial and to be tried before an impartial jury by restricting defense counsel's examination of prospective jurors, (2) the trial court improperly admitted into evidence a videotaped forensic interview of the victim, (3) the trial court violated his rights to due process, to a fair and impartial trial, and to be convicted by means of a unanimous verdict because the deadlocked jury instructions that it provided to the jury were coercive and misleading, and (4) this court, in the exercise of its supervisory authority over the administration of justice, should require trial courts, when delivering deadlocked jury instructions, to instruct the jury that it need not reach a verdict and that jurors have the right to disagree with respect to the proper verdict. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. The defendant is the victim's biological father. In 2010, when the victim was approximately six years old, the defendant obtained full physical custody of the victim as a consequence of drug abuse and mental health issues affecting the victim's biological mother. Initially, the victim resided with the defendant; her stepmother, M; her half sister, H; and other relatives. The victim and H are close in age, shared a close bond, and attended the same school. Later, the defendant, M, H, and the victim moved to a different residence.

On numerous occasions, the defendant used physical force to discipline the victim and H. The defendant often struck the victim on her buttocks, back, and arms with his bare hands or physical objects such as a belt or an extension cord. Occasionally, if the use of force resulted in visible injuries to the victim, the defendant would make the victim conceal her bruises with clothing or he would keep her home from school.

One night in 2011 or 2012, when the victim was seven or eight years of age, the defendant verbally and physically assaulted M in the victim's presence, following which M and H left the residence. The victim, preparing to take a shower, went into her bedroom, undressed, and wrapped herself in a towel. The defendant entered the bedroom and told the victim that he had received a telephone call from her teacher and was upset to have learned that the victim had misbehaved in class. After the victim and the defendant discussed this matter, the defendant instructed the victim to remove her towel and bend over a nearby bed. The victim, expecting to be struck by the defendant as a form of discipline,

complied with the defendant's instruction.

The victim positioned herself on all fours on the bed. As the defendant stood behind her, at the edge of the bed, he touched the victim's anus and her vagina with his penis. Penetration did not occur.[2] As the incident progressed, the defendant pushed the victim down so that her head and chest were on the bed. When the victim told the defendant to stop touching her, he responded by telling her to be quiet. Despite the fact that the defendant's hands were on the victim's waist, he stated that he was using "his thumb." After a few minutes, the defendant stopped what he was doing, told the victim to remain bent over until he left her bedroom, and walked into another room. The victim was confused by the defendant's conduct and knew that it was "bad . . . ." She proceeded to use the shower. After the victim showered, the defendant told her that they were going out to get pizza for dinner, and he stated that "what happened in the house stays in the house." The victim understood this to mean that the defendant did not want her to discuss what he had done to her in the bedroom, and she believed that, if she told anyone about it, it would either happen again or the defendant would punish her by beating her.

The defendant and M later separated, and the victim thereafter resided with the defendant and his new girlfriend. The victim resided there until December, 2015, when the defendant was arrested on charges unrelated to the present case. The victim was placed in the custody of her maternal grandmother, B. Thereafter, the Department of Children and Families (department) investigated allegations that the victim had suffered physical abuse caused by the defendant. The department also investigated concerns expressed by B that the defendant had acted inappropriately toward the victim because he had a habit of kissing the victim on the lips. Ultimately, the victim disclosed to a department social worker that the defendant had done something that made her uncomfortable and that he "tried to say it was his finger . . . ." During a forensic interview at Yale-New Haven Hospital's Child Sexual Abuse Clinic in 2016, the victim provided details of the incident involving the defendant's contact with her intimate parts in her bedroom. The defendant's arrest and conviction followed. Additional facts will be set forth as necessary.

I

First, the defendant claims that the trial court violated his right to a fair trial and to be tried before an impartial jury by restricting defense counsel's examination of prospective jurors. Specifically, the defendant claims that the court improperly prohibited defense counsel from asking prospective jurors to express their opinions with respect to parents who kiss their children on the lips. We disagree.

The following additional facts and procedural history are relevant to this claim. On October 16, 2018, the second day of jury selection, defense counsel alerted the court to the fact that the state was in possession of photographs depicting the defendant kissing H on the lips. Defense counsel expressed her belief that the state intended to introduce these photographs in evidence over defense counsel's objection. The court, *B. Fischer, J.*, added that, during the victim's forensic interview, the victim indicated that the defendant had kissed her on the lips. In light of the possibility that evidence of the defendant's habit of kissing his daughters on the lips was likely to be before the jury, defense counsel opined that some potential jurors would have a very strong reaction to such evidence. She argued that it was part of her obligation in selecting a fair and impartial jury to ask prospective jurors to express their feelings about that behavior. Defense counsel provided the court with the type of inquiry she believed was appropriate, stating: "I guess I would ask a venireperson, do they have opinions about how parents might show affection to their children and . . . might they have opinions about whether parents kiss their children . . . as part of showing affection, and might they also have any strong opinions one way or another about whether . . . it's okay for parents to kiss their children on the lips, in terms of . . . is that a common thing in their mind in terms of showing affection." The prosecutor objected to any inquiry concerning kissing or "physically showing affections between a parent and child."

The court responded, "[t]he kissing is too fact specific. You know, prospective jurors may not be questioned regarding their predisposition to decide issues with respect to evidence that may be offered at trial or with the intent to condition them to prejudge issues that will affect the outcome of the trial. I have no issues with a question along the following lines . . . 'Do you understand that parents can have different methods of showing physical affection to their children' or a question like that, but to specifically ask about kissing on the lips is too fact specific." Defense counsel asked whether a question about kissing on the lips could be asked in the event that a venireperson raised the issue. The court stated that such a follow-up inquiry was not permissible because it would be "too fact specific." The court clarified that defense counsel could ask questions about a parent engaging in "different methods of showing physical affection to their child" but that defense counsel could not ask about kissing on the lips. Defense counsel stated that she disagreed with the court's ruling but that she would abide by it.

Later, during the second day of jury selection, defense counsel asked several venirepersons whether they had opinions concerning how parents show affection to their children.[3] The prosecutor did not object to defense

counsel's examination in this regard, and the court did not interfere with the examination in this regard. For example, during questioning of venireperson M.A., the following colloquy occurred:

"Q. . . . Do you have any opinion about how parents show affection to children?

"A. I think there's a lot of different ways that parents can show affection.

"Q. It kind of runs the gamut, right?

"A. Yep.

"Q. In your personal opinion, do you think that, you know, do you have, kind of like, what's appropriate versus inappropriate?

"A. Well, I have, you know, how my parents showed me affection throughout my life and . . . that's basically it, you know.

"Q. Okay. But if you saw sort of something other than what your parents showed you.

"A. Um-hm.

"Q. Do you . . . you know, I guess would you just have an opinion as to what was appropriate versus—

"A. I wouldn't make any sort of, like, judgmental determinations on it if it was the proper way to show affection or not."

During defense counsel's examination of venireperson K.G., the following colloquy occurred:

"Q. How about different forms of parents showing affection for their kid; do you think some are kind of okay and some are not okay?

"A. In terms of like hugging a child?

"Q. Hugging. Kissing. Yeah.

"A. Or just kissing your child, that's fine.

"Q. Okay. Anything that in your mind would cross the line that you think is just totally inappropriate?

"A. Not if it's not abusive, no."

During defense counsel's examination of venireperson C.D., the following colloquy occurred:

"Q. . . . Do you have any opinion about how parents show children affection?

"A. I think it's great that they do. I think any parent should show their children affection.

"Q. Okay. Do you have an opinion as to . . . what might be appropriate versus inappropriate?

"A. That's what I am when we're hugging and, you know, giving encouragement and being positive. That's kind of what I know."

During defense counsel's examination of venire-person E.B., the following colloquy occurred:

"Q. . . . Do you have any opinions about how parents should show love or affection toward their children physically?

"A. As much as you can.

"Q. Um-hm.

"A. There's a lot that you can do.

"Q. Um-hm. Anything in your mind that, like, crossed the line where it would become kind of inappropriate?

"A. More than a hug and a kiss, I would imagine."

Finally, during defense counsel's examination of venireperson J.S., the following colloquy occurred:

"Q. . . . Do you have any sort of opinion one way or the other about how parents show affection for their children?

"A. I mean, yeah, I mean, there's some parents that will kiss their kids on the cheek, there's other ones that kiss their kids on the lips. I mean, different breakpoints, to certain things.

"Q. Right.

"A. I mean, I've showered with both my daughters when they were younger, but you get to a point where it's like, all right, now that's gotta stop.

"Q. Sure. Do you have any opinion one way or the other, or you just know that it kind of happens?

"A. I think that . . . it happens. Right. And . . . it changes depending on the family dynamic."

The following day, the third day of jury selection, the court invited the parties to make arguments concerning the admissibility of a photograph of the defendant kissing H on the lips. The prosecutor represented that she intended to introduce the photograph into evidence, arguing that it was probative with respect to the type of kissing the defendant engaged in with his daughters. Defense counsel argued that the photograph was "inflammatory" and that it would arouse the passions of the jurors. Defense counsel argued that, when compared to the high degree of prejudice that flowed from the photograph, it had only limited probative value, as it was not direct evidence of any of the crimes with which the defendant stood charged. Defense counsel argued that it was misconduct evidence that merely corroborated the victim's testimony that the defendant had a habit of kissing her on the lips.

The court excluded the photograph from evidence. The court stated: "I'm not going to allow it in. It is a picture of [H], who is not the complainant here. Clearly, as I understand it, there will be evidence from the com-

plainant that the defendant did kiss her on the mouth . . . but we'll wait to hear that testimony. But this is separate. This is not the complainant's photo, it's the stepsister. The court finds it's too inflammatory, too prejudicial to the defendant." During the remaining three days of jury selection that followed the court's ruling, defense counsel did not question prospective jurors about their opinions, if any, with respect to displays of affection between parents and their children.

Prior to the victim's testimony at trial, defense counsel expressly agreed that testimony about the fact that the defendant had kissed the victim on the lips was admissible. The victim subsequently testified that the defendant had a habit of kissing her on the lips, that this behavior "bother[ed]" her, and that she asked the defendant to kiss her on the cheek instead. The victim testified, however, that the defendant continued to kiss her on the lips.[4] Kelly Adams, a department investigator, testified at trial that, when she spoke with B, she stated that "she believed something happened because [the defendant] would kiss [the victim on] the mouth and she didn't like it, she said it made her feel very uncomfortable . . . ." Adams further testified that B's statements led her to question the victim as to whether anyone had done something that made her feel uncomfortable, and that this inquiry resulted in the victim's initial disclosure of sexual abuse by the defendant. Adams testified that the defendant mentioned to her that he was aware of the fact that others had told her that he had kissed the victim on the lips but that he had not behaved inappropriately. During closing argument, the state did not rely on evidence related to the defendant's habit of kissing the victim on the lips.

As he did at trial, the defendant argues on appeal that the court improperly limited the scope of his examination of prospective jurors. The defendant argues that the evidence of the defendant's kissing his daughter on the lips was "highly controversial," "many people view [this type of behavior] as inappropriate and offensive," the conduct "was a central issue in this case," and the court's prohibition on questions directly addressing this conduct "violated his constitutional rights to a fair trial and to be tried by an impartial jury . . . ." The defendant argues that the court's ruling precluded him from asking questions of prospective jurors that may have reflected the existence of bias and impartiality. The defendant argues that the inquiry he wanted to undertake was not designed "to ask jurors how they would decide the facts or issues in this case; rather, [the defendant] wanted to determine if jurors would be unable to judge this case fairly once they heard that evidence." The defendant also argues that the curtailed inquiry limited to forms of affection was not adequate, for it failed to give him any insight as to whether potential jurors had strong emotional reactions to a parent kissing a child on the lips.

Having set forth the nature of the defendant's claim, we next set forth the relevant principles of law. "Voir dire plays a critical function in assuring the criminal defendant that his [or her] [s]ixth [a]mendment right to an impartial jury will be honored. . . . Part of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors. . . . Our constitutional and statutory law permit each party, typically through his or her attorney, to question each prospective juror individually, outside the presence of other prospective jurors, to determine [his or her] fitness to serve on the jury. . . . Because the purpose of voir dire is to discover if there is any likelihood that some prejudice is in the [prospective] juror's mind [that] will even subconsciously affect his [or her] decision of the case, the party who may be adversely affected should be permitted [to ask] questions designed to uncover that prejudice. This is particularly true with reference to the defendant in a criminal case. . . . The purpose of voir dire is to facilitate [the] intelligent exercise of peremptory challenges and to help uncover factors that would dictate disqualification for cause." (Internal quotation marks omitted.) *State* v. *Holmes*, 334 Conn. 202, 222–23, 221 A.3d 407 (2019); see also *State* v. *Rios*, 74 Conn. App. 110, 114, 810 A.2d 812 (2002) (discussing constitutional and statutory basis for right to question prospective jurors individually), cert. denied, 262 Conn. 945, 815 A.2d 677 (2003). Moreover, we recognize that the right to a voir dire examination of each prospective juror to elicit the indicia of prejudice "cannot be replaced by a court's charge, which is addressed to a group and does not elicit answers." *State* v. *Rogers*, 197 Conn. 314, 318, 497 A.2d 387 (1985).

Our decisional law reflects, however, that the type of inquiry that is permissible to uncover prejudice on the part of prospective jurors has its limits. "The court has a duty to analyze the examination of venire members and to act to prevent abuses in the voir dire process." *State* v. *Dolphin*, 203 Conn. 506, 512, 525 A.2d 509 (1987). "[I]f there is any likelihood that some prejudice is in the [prospective] juror's mind [that] will even subconsciously affect his [or her] decision of the case, the party who may be adversely affected should be permitted [to ask] questions designed to uncover that prejudice. . . . The latitude . . . afforded the parties in order that they may accomplish the purposes of the voir dire [however] is tempered by the rule that [q]uestions addressed to prospective jurors involving assumptions or hypotheses concerning the evidence which may be offered at the trial . . . should be discouraged . . . . [A]ll too frequently such inquiries represent a calculated effort on the part of counsel to ascertain before the trial starts what the reaction of the venire[person] will be to certain issues of fact or law or, at least, to implant in his mind a prejudice or prejudgment on those issues. Such an effort transcends the proper

limits of the voir dire and represents an abuse of the statutory right of examination. . . .

"Thus, we afford trial courts wide discretion in their supervision of voir dire proceedings to strike a proper balance between [the] competing considerations . . . but at the same time recognize that, as a practical matter, [v]oir dire that touches on the facts of the case should be discouraged. . . . [T]he permissible content of the voir dire questions cannot be reduced to simplistic rules, but must be left fluid in order to accommodate the particular circumstances under which the trial is being conducted. Thus, a particular question may be appropriate under some circumstances but not under other circumstances. . . . The trial court has broad discretion to determine the latitude and the nature of the questioning that is reasonably necessary to search out potential prejudices of the jurors." (Citation omitted; internal quotation marks omitted.) *State* v. *Patel*, 186 Conn. App. 814, 846–47, 201 A.3d 459, cert. denied, 331 Conn. 906, 203 A.3d 569 (2019). "The court has wide discretion in conducting the voir dire . . . and the exercise of that discretion will not constitute reversible error unless it has clearly been abused or harmful prejudice appears to have resulted." (Citations omitted.) *State* v. *Dahlgren*, 200 Conn. 586, 601, 512 A.2d 906 (1986).

Our analysis must focus on "the scope of the trial court's ruling, i.e., what specific question or questions actually were prohibited." *State* v. *Lugo*, 266 Conn. 674, 684, 835 A.2d 451 (2003). As discussed previously in this opinion, in light of the likelihood that the state would present evidence that the defendant had shown affection to one or more of his children by kissing them on the lips, the court's prohibition was limited only to the question related to a parent kissing a child on the lips. The court, nonetheless recognizing the nature of the inquiry sought by defense counsel, expressly clarified that its ruling did not preclude defense counsel from asking whether prospective jurors had opinions about parents using different methods of physical affection toward a child.

Because the trial court is vested with broad discretion in conducting the voir dire, there are few, if any, bright-line rules that we may employ in reviewing its rulings related thereto. Indeed, this court has observed that, "[d]espite its importance, the adequacy of voir dire is not easily subject to appellate review." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Rios*, supra, 74 Conn. App. 115. We note that, in the present case, the court's ruling was extremely narrow, and the ruling prohibited only an inquiry that was related to specific evidence in the case. The ruling, therefore, prevented defense counsel from using voir dire for the improper purposes of ascertaining prospective jurors' opinions about the evidence that would be presented

at trial or implanting in the jurors' minds an opinion about the evidence. We also note that the court provided defense counsel wide latitude to inquire whether prospective jurors had opinions about the general topic of physical displays of affection. Although the defendant's arguments suggest otherwise, physical displays of affection may include kissing on the lips. Thus, to the extent that defense counsel deemed it important to determine if prospective jurors had prejudices against parents kissing their children on the lips, the court afforded defense counsel latitude to accomplish the purposes of the voir dire in that it permitted defense counsel to raise the general topic of a parent's physical display of affection. Our assessment in this regard is proven by the fact that, although defense counsel asked only five prospective jurors about a parent's physical display of affection, three of those prospective jurors (K.G., E.B., and J.S.) stated an opinion about kissing. Moreover, one of these prospective jurors (J.S.) stated an opinion about kissing on the lips.

As both this court and our Supreme Court have observed, the trial court in supervising voir dire must balance the competing considerations of protecting a party's inviolate right to ask questions to uncover prejudice and avoiding inquiries that touch on the facts before the jury. See, e.g., *State* v. *Pollitt*, 205 Conn. 61, 75, 530 A.2d 155 (1987); *State* v. *Rios*, supra, 74 Conn. App. 117–18. We are convinced that the court properly struck a balance between these considerations and permitted an inquiry that was sufficient to uncover juror bias against a parent's physical display of affection, including kissing on the lips.

A court's exercise of its discretion to restrict voir dire "will not constitute reversible error unless it has clearly been abused or harmful prejudice appears to have resulted." *State* v. *Dahlgren*, supra, 200 Conn. 601; see also *State* v. *Dolphin*, supra, 203 Conn. 512 (same), and cases cited therein. Beyond concluding that the court did not abuse its discretion, we likewise conclude for the reasons that follow that the defendant has failed to demonstrate that the court's ruling resulted in harmful prejudice.[5]

As we stated previously in this opinion, at the time that the court made the ruling at issue, it had yet to rule on the photograph that the state wanted to introduce that depicted the defendant kissing H on the lips. The following day of jury selection, the court ruled that the photograph was not admissible. It appears that defense counsel's desire to uncover possible prejudice related to a parent kissing a child on the lips was largely motivated by the possibility that this photograph would be part of the evidence.[6] Following its exclusion, there was no photographic evidence of the defendant kissing the victim, or any child, on the lips. Furthermore, as we previously discussed, the subject of the defendant's

kissing the victim on the lips was not a prominent part of the evidence, which was presented to the jury over the course of three days. Although the jury heard evidence that the defendant had kissed the victim on the lips, that the victim objected to the kissing, and that B's concern that the defendant's habit of kissing the victim on the lips led Adams to investigate whether the victim had been sexually abused, the defendant's conduct in kissing the victim on the lips did not form the factual basis of any of the offenses with which he stood charged. Moreover, the prosecutor did not rely on the evidence of kissing during her closing argument. Finally, we note that the defendant's prejudice argument stems from his belief that the jury would be "unable to judge this case fairly once they heard [the] evidence [related to his kissing the victim on the lips]." The fact that the jury rendered a split verdict in this case, finding the defendant not guilty of the more serious sexual assault charges; see footnote 2 of this opinion; lends some support to our conclusion that the limitation on voir dire did not result in a jury that was unable to carefully and fairly consider each of the charges and the evidence related thereto. Given the slight role that the evidence of kissing played in the trial, the fact that the evidence that was presented to the jury related to kissing was not inherently prejudicial in nature, we are not persuaded that harmful prejudice resulted to the defendant as a result of the court's ruling.

II

Next, the defendant claims that the court improperly admitted into evidence a videotaped forensic interview of the victim. We disagree.

The following facts are relevant to this claim. Prior to trial, the state filed a notice of its intent to offer into evidence a video recording of the victim's forensic interview that occurred on March 9, 2016, and was conducted by Monica Vidro Madigan, a clinical social worker employed by the Yale-New Haven Hospital's Child Sexual Abuse Clinic. Later, the defendant filed a motion in limine to preclude the admission of the video. The defendant assumed for purposes of his motion that the victim would testify at trial and would be able to recall and narrate the details of her sexual abuse allegations against the defendant. The defendant expressly stated that he did not object to the admissibility of the video on hearsay grounds. Instead, the defendant raised what he characterized as an objection related to "relevance and bolstering . . . ." The defendant argued that the video had limited probative value and was unduly prejudicial to him. In arguing that it was unduly prejudicial, defense counsel argued that it was unnecessary and cumulative evidence of the facts to be elicited during the victim's trial testimony, and it would improperly bolster the victim's testimony.

Following the victim's trial testimony, on October 24,

2018, the court heard arguments on the motion. Defense counsel reiterated that the video would not add anything to the victim's trial testimony and argued that the admission of the video would constitute an improper bolstering of that testimony. Defense counsel argued that "[the victim] had clear recollection. She did not have any confusion about the details. This isn't a case like some where the child [victim] kind of broke down and had trouble and, therefore, the state tried to offer this evidence [of prior disclosure] . . . . [The victim] had clear detail, clear memory and so I think to pile on another version of her statement, it's very prejudicial and I think it's cumulative . . . . It's really important to be clear about bolstering. And so I think, here, when you're allowing . . . the jury to hear twice, once live in person, once on a tape-recorded forensic interview from the same complainant, that really . . . is highly prejudicial. . . .

"[T]here's nothing contained in that forensic interview which was not already testified to by [the victim] in front of this jury. It would simply be a rerun of her testimony, of course without any sort of cross-examination there, and I think . . . its prejudicial impact outweighs its probative value. I don't think it has any probative value. We've heard her testimony." Defense counsel acknowledged, however, that she was unaware of any authority to support the proposition that a forensic interview is not admissible evidence.

Responding to the argument that the evidence was cumulative, the prosecutor argued that the details provided by the victim during the forensic interview differed in some ways from the details provided by the victim during her trial testimony. For example, the prosecutor stated that the victim provided different descriptions of the alleged anal penetration by the defendant.[7] The prosecutor also responded that the state was seeking the admission of the video under the medical diagnosis and treatment exception to the rule against hearsay.

The court stated that "the record obviously reflects that the [victim] did appear here at this trial and was subject to cross-examination, and the forensic interview will be admitted, and that's going to be admitted under the medical diagnosis and treatment exceptions to the hearsay rule, [Connecticut Code of Evidence § 8-3 (5)], and our existing case law under *State* v. *Griswold*, [160 Conn. App. 528, 127 A.3d 189, cert. denied, 320 Conn. 907, 128 A.3d 952 (2015)]. You know, the purpose of the interview is to minimize trauma so a child doesn't have to repeat allegations to numerous officials such as school officials, [the department], police, et cetera, and it also . . . assesses medical and mental health needs of the particular child, and it also advances and coordinates the prompt investigation of suspected cases of child abuse. So, for those reasons, and no existing case law to support the defendant's position,

I am going to deny the defendant's motion." The video of the forensic interview was admitted into evidence during the testimony of Vidro Madigan.[8]

On appeal, the defendant argues as he did at trial that "[t]he only purpose of the video was to bolster [the victim's] testimony at trial, and it was unnecessary because she testified. Moreover, the prejudicial effect of this evidence greatly outweighed its probative value. By allowing the state to double-team its case in this manner when [the victim's] credibility was crucial to the outcome, the court committed harmful error." The defendant argues that the court summarily rejected the basis of his objection by stating that the video was admissible under the medical treatment and diagnosis exception to the rule against hearsay but failed to address the issue of whether the probative value of the video, if any, was outweighed by its prejudicial effect. The defendant argues that the court failed to analyze the objection raised in that it "automatically" determined that the video was admissible after concluding that it fell within the hearsay exception and, thus, failed to exercise any discretion with respect to the issue of whether the evidence was unduly prejudicial. The defendant argues that, even if the court conducted the proper balancing test, it incorrectly exercised its discretion to admit the video in evidence.

"We review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . The trial court has wide discretion to determine the relevancy [and admissibility] of evidence . . . . In order to establish reversible error on an evidentiary impropriety . . . the defendant must prove both an abuse of discretion and a harm that resulted from such abuse." (Citations omitted; internal quotation marks omitted.) *State* v. *Cecil J.*, 291 Conn. 813, 818–19, 970 A.2d 710 (2009).[9]

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." Conn. Code Evid. § 4-1. Irrelevant evidence is inadmissible and, unless there is a basis in law for its exclusion, "[a]ll relevant evidence is admissible . . . ." Conn. Code Evid. § 4-2. "Relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice . . . or by considerations of . . . needless presentation of cumulative evidence." Conn. Code Evid. § 4-3. "Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether

it is damaging to the defendant but whether it will improperly arouse the emotions of the [jurors].'' (Internal quotation marks omitted.) *State* v. *Wilson*, 308 Conn. 412, 429–30, 64 A.3d 91 (2013).

"By cumulative evidence is meant additional evidence of the same general character, to the same fact or point which was the subject of proof before." *Waller* v. *Graves*, 20 Conn. 305, 310 (1850). "In excluding evidence on the ground that it would be only cumulative, care must be taken *not* to exclude merely because of an *overlap* with evidence previously received. To the extent that evidence presents new matter, it is obviously not cumulative with evidence previously received." (Emphasis in original; internal quotation marks omitted.) *State* v. *Parris*, 219 Conn. 283, 293, 592 A.2d 943 (1991).

Preliminarily, we reject the defendant's contention that the court, having concluded that the video was admissible under the medical diagnosis and treatment exception to the rule against hearsay; see Conn. Code Evid. § 8-3 (5); "summarily reject[ed]" his argument that the video should be excluded because it was unduly prejudicial and cumulative. The record reflects that the court, in its oral ruling, did not specifically address the defendant's arguments that the video, although admissible under a well established exception to the rule against hearsay, should be excluded because it was unduly prejudicial and cumulative. Instead, the court explicitly stated that the evidence fell within the hearsay objection. The court, however, also used broad language that suggests that it had considered and rejected the specific grounds of the defendant's objection by stating that it was unable to identify "existing case law to support the defendant's position . . . ."

Thus, the court's oral ruling does not unambiguously reflect whether it exercised its discretion and considered the grounds raised in the defendant's objection. Nonetheless, our review of the relevant portion of the transcript of the trial proceedings does not suggest that the court failed to consider both of these grounds and did not exercise its discretion. "In the discretionary realm, it is improper for the trial court to fail to exercise its discretion." *State* v. *Lee*, 229 Conn. 60, 73–74, 640 A.2d 553 (1994). Although the court did not explicitly refer to these grounds, there is nothing in the court's statements to indicate that it erroneously believed that it lacked the discretion to exclude the evidence at issue. Cf. id. (record reflects that trial court's evidentiary ruling was result of mistaken belief that evidence was categorically inadmissible); *State* v. *Martin*, 201 Conn. 74, 88–89, 513 A.2d 116 (1986) (record reflects that trial court's evidentiary ruling was result of expressed belief that it lacked discretion to preclude evidence). In light of the foregoing and in conformity with our precedent, we will not presume error in the court's analysis but

instead presume that the court properly exercised its discretion and considered the merits of the objection raised. "In Connecticut, our appellate courts do not presume error on the part of the trial court. . . . Rather, the burden rests with the appellant to demonstrate reversible error." (Internal quotation marks omitted.) *Pettiford* v. *State*, 179 Conn. App. 246, 260–61, 178 A.3d 1126, cert. denied, 328 Conn. 919, 180 A.3d 964 (2018).

We now turn to the merits of the evidentiary claim. We readily conclude that the forensic interview of the victim by Vidro Madigan was relevant. Therein, the victim described in detail the incident giving rise to the offenses with which the defendant was charged. The defendant does not argue that the video lacked probative value because it did not tend to make it more or less probable that the defendant committed one or more of the charged offenses. Instead, the defendant argues that "[t]he video had little, if any, probative value because [the victim], who was fourteen years old at the time of trial, testified without hesitation and gave a complete recounting of her allegations. She did not seem confused or uncertain about any of the details and did not claim she could not remember them." These arguments lead us to observe that the defendant improperly conflates what is relevant evidence and what is cumulative evidence.

The victim's forensic interview was highly probative with respect to the defendant's conduct during the incident in which he made contact with her vagina and anus.[10] The defendant was charged with two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1). One count was premised on the allegation that the defendant forcibly engaged in penile-vaginal intercourse with the victim, and one count was premised on the allegation that the defendant forcibly engaged in penile-anal intercourse with the victim.

Section 53a-70 (a) provides in relevant part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ." "'Sexual intercourse' means vaginal intercourse, anal intercourse, fellatio or cunnilingus between persons regardless of sex. Penetration, however slight, is sufficient to complete vaginal intercourse, anal intercourse or fellatio and does not require emission of semen. Penetration may be committed by an object manipulated by the actor into the genital or anal opening of the victim's body." General Statutes § 53a-65 (2). The victim's statement in the forensic interview that she felt something

"inside" of her vagina and anus made it more likely that penetration of the vagina and anus had occurred.

Moreover, the state charged the defendant with risk of injury to a child in violation of § 53-21 (a), which provides in relevant part: "Any person who . . . (2) has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate parts of such person, in a sexual and indecent manner likely to impair the health or morals of such child . . . shall be guilty of . . . (B) a class B felony for a violation of subdivision (2) of this subsection, except that, if the violation is of subdivision (2) of this subsection and the victim of the offense is under thirteen years of age, such person shall be sentenced to a term of imprisonment of which five years of the sentence imposed may not be suspended or reduced by the court." This charged offense required the state to prove not only that intimate contact with the victim's intimate parts occurred but that it occurred in a sexual and indecent manner likely to impair the health or morals of the victim. The victim's forensic interview provided additional insight into the manner in which the intimate contact with her private parts occurred, specifically, her belief that she felt "[a] man's private" make contact with her private parts. This additional detail made it more likely that the defendant used his penis during the incident. This, in turn, made it more likely that the intimate contact not only occurred in a sexual and indecent manner but that it was likely to impair the victim's health or morals. Accordingly, we are not persuaded that the evidence was irrelevant or that it should have been excluded because it was cumulative. Indeed, we conclude that the evidence was highly probative.

Having discussed the considerable probative value of the video of the forensic interview, we now consider the defendant's argument that its probative value was outweighed by the risk of undue prejudice to the defense. The defendant posits that the danger of prejudice arose from the fact that the video improperly bolstered the victim's testimony because it essentially constituted constancy of accusation evidence, the video placed an undue emphasis on her testimony, and the video unduly aroused the jurors' sympathy for the victim. We disagree with these contentions.

The defendant's attempt, for the first time on appeal, to recast the video as constancy of accusation evidence is unavailing. The state did not offer the video as constancy of accusation evidence. The state argued that the video was admissible under the medical diagnosis and treatment exception to the rule against hearsay; see Conn. Code Evid. § 8-3 (5); and because it provided additional details to the manner in which the contact at issue occurred. The defendant agreed at trial, and

does not dispute on appeal, that the video fell within the hearsay exception. The evidence consisted of the victim's own statements to a medical provider, not the statements of multiple third parties to whom she disclosed abuse. The court admitted the video without limitation. Thus, it was admitted for substantive purposes instead of merely being corroborative of the credibility of the victim, which is the sole proper use of constancy of accusation testimony. See, e.g., *State* v. *Daniel W. E.*, 322 Conn. 593, 612–13, 142 A.3d 265 (2016) (discussing limited purpose for which constancy of accusation testimony should be considered).

Moreover, the defendant did not suggest, as he does on appeal, that the videotaped forensic interview, which occurred in March, 2016, was generated merely to prepare the victim for the trial that occurred more than two years later. The defendant's suggestion that the interview was essentially manufactured by the prosecutor for use at trial lacks any factual basis. The forensic interview was conducted by a clinical social worker, and the video did not contain the opinions of expert witnesses about the victim's credibility or statements of third parties to whom the victim disclosed abuse.[11] We are not persuaded that the video unfairly bolstered the victim's credibility.

Next, the defendant argues that the video was unduly prejudicial in that it placed an improper emphasis on the victim's testimony by permitting the victim to testify twice, once as a witness and once by means of the video. The defendant relies on *State* v. *Gould*, 241 Conn. 1, 9–15, 695 A.2d 1022 (1997), in which the state was permitted to present at trial the videotaped testimony of a state's witness, who, for health reasons, could not be present in court to testify. Id., 10. During the jury's deliberations, it requested to view the videotaped testimony in the jury room. Id., 11. The court granted the request. Id. On appeal, the defendants in *Gould* claimed that it was improper for the court to have granted the request to replay the videotaped testimony in the jury room, outside of the court's supervision, and that they were prejudiced by the court's ruling because it "unduly emphasized" the witness' testimony, essentially permitting the witness to testify twice. Id., 12.

Our Supreme Court rejected the argument that the rules of practice prohibited the trial court from permitting the replay of the videotaped testimony in the jury room. See id. The court determined that the ruling did not reflect an abuse of the trial court's discretion because "the most reliable means for the jury to review [the witness'] testimony was to view the videotape." Id., 13. Our Supreme Court, however, exercised its supervisory authority over the administration of justice to require that, "[w]here a court decides, pursuant to that court's sound discretion, that the jury should be permitted to replay videotaped deposition testimony, it must

be done in open court under the supervision of the trial judge and in the presence of the parties and their counsel." Id., 15. Our Supreme Court, in concluding that the ruling was not improper, nonetheless noted that the defendants had raised valid concerns that might have existed in other cases in which a danger existed that a jury might have given undue weight to the video-taped testimony of a witness over that witness' in-court testimony. See id., 14.[12]

The court's concern in *Gould* centered on the jury's unsupervised use of videotaped testimony during its deliberations. The court, in the exercise of its supervisory authority, did not prohibit the admission of video-taped forensic interviews. It required that, when a trial court permits a jury to replay videotaped deposition testimony, it must be done in open court under the supervision of the trial judge and in the presence of the parties and their counsel. Id., 15. The defendant's claim in the present case concerns the admissibility of the videotaped forensic interview; the defendant has not raised a claim of error related to the jury's unsupervised use of the videotaped forensic interview in the jury room. Thus, we are not persuaded that *Gould* supports his claim of undue prejudice.

Finally, the defendant argues that the video was unduly prejudicial because it generated sympathy for the victim. Specifically, the defendant claims that statements made by Vidro Madigan during her questioning of the victim engendered feelings of sympathy for the victim because Vidro Madigan expressed feelings of empathy to the victim. Vidro Madigan testified that her duties as a clinical social worker did not include making a determination as to the credibility of the victim's allegations. See footnote 11 of this opinion. Thus, it is likely that the jury would have interpreted any statements that suggested empathy to have reflected Vidro Madigan's effort to build a rapport with the victim during the interview, not a genuine belief by Vidro Madigan that the victim was being truthful or a belief that she had actually suffered any abuse at the hands of the defendant.

The defendant also relies on the fact that the video depicted the victim, aged twelve, discussing the details of her allegations of sexual abuse with "a stranger," and that the victim made some comments in the video, but not in her live testimony, that would have generated sympathy for her. These comments by the victim included a description of a picture that she drew of a flower that represented her and her mother, multiple references to the defendant having "forced [her] to have sex with him," and an expressed preference in favor of living with her grandmother because her grand-mother did not beat her.

At the time of trial, the victim was fourteen years of age and in the eighth grade. The victim was examined

and cross-examined at length in open court about the allegations of sexual abuse. We are not persuaded that the mere fact that she discussed her allegations at age twelve with Vidro Madigan was likely to cause any additional feelings of sympathy in the eyes of the jurors than would the fact that she endured testifying at trial. Moreover, we recognize that the victim's statements to Vidro Madigan at age twelve were not identical to her trial testimony. To the extent that she used different language at the trial, however, to describe the allegations and her relationship with the defendant, the statements were not so different in nature that they were likely to engender strong feelings of sympathy over those that may have been engendered by the victim's trial testimony.

"To be unfairly prejudicial, evidence must be likely to cause *a disproportionate emotional response in the* [*jurors*], thereby threatening to overwhelm [*their*] neutrality and rationality to the detriment of the opposing party. . . . A mere adverse effect on the party opposing admission of the evidence is insufficient. . . . Evidence is prejudicial when it tends to have some adverse effect [on] a defendant beyond tending to prove the fact or issue that justified its admission into evidence." (Emphasis added; internal quotation marks omitted.) *State* v. *Miguel C.*, 305 Conn. 562, 575–76, 46 A.3d 126 (2012). In substance, the victim, in her trial testimony and during her forensic interview, described the fact that she made a drawing depicting her and her mother, the fact that the defendant forced her to submit to the sexual contact that occurred in her bedroom, and the fact that the defendant beat her. Thus, the video did not introduce facts that were of a materially different nature than those introduced during the trial, and, thus, we are not persuaded that the differences in facts, to the extent they existed, unduly prejudiced the defendant.

For the foregoing reasons, we conclude that the court's admission of the videotaped forensic interview of the victim did not reflect an abuse of its discretion.

### III

Next, the defendant claims that the trial court violated his rights to due process, to a fair and impartial trial, and to be convicted by means of a unanimous verdict because the deadlocked jury instructions the court provided to the jury were coercive and misleading. We disagree.

The following additional facts are relevant to this claim. The jury deliberated over the course of four days. On the third day of jury deliberations, the jury sent the court a note, stating: "At this time, the jury is not unanimous on any of the three charges. It does not appear this will change with additional deliberation time." Outside of the jury's presence, the court discussed the note with counsel. The court noted that it

was prepared to deliver to the jury deadlocked jury instructions, also known as "Chip Smith" instructions.[13] The court stated that it would use the model jury instructions on the Judicial Branch website that pertain to deadlocked juries. See Connecticut Criminal Jury Instructions 2.10-4, available at https://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited December 21, 2021). Defense counsel submitted a written request that the court instruct the jury with *some* of the language from the instructions found on the Judicial Branch website but with added language at the beginning of the instructions to clarify that *the jury need not reach a verdict.* The language in the first paragraph of the defendant's requested instructions forms the basis of the present claim.[14] Defense counsel addressed the court, noting that, if a unanimous verdict was not possible, the jury should be informed that its failure to reach a verdict was "a perfectly proper outcome." The court noted that it had considered the defendant's request but that it would deliver the model instructions from the Judicial Branch website.[15] After the court delivered its instructions, defense counsel reiterated that the defendant not only objected to the court's failure to instruct the jury in accordance with the first paragraph of his requested instructions but that the defendant also objected to the last paragraph of the court's instructions. Defense counsel argued that the last paragraph of the court's instructions suggested that the jury *should* agree on a verdict, and, thus, it was unduly coercive in nature. The court noted the objection. The following day, the jury returned a verdict. At the defendant's request, each member of the jury was individually polled, and each juror indicated that he or she agreed with the verdict.

On appeal, the defendant argues that, "[u]nlike the standard instruction [delivered by the court], the proposed instruction made it clear the jurors had the right not to agree and that the court was not suggesting a verdict had to be reached. Under the circumstances of this case, where, after three days of deliberating the jurors indicated further deliberations would not be fruitful, the verdict was the result of an impermissibly coercive and misleading instruction." The defendant acknowledges that the instruction that the court delivered to the jury has survived prior judicial scrutiny yet asserts that "there was no reason for the court to reject [his] proposed instruction, which was a more balanced instruction that accurately stated the law." The defendant argues that, because the possibility of a hung jury is a consequence of the unanimity requirement, a court sends the wrong message when it suggests that the jury's inability to reach a verdict is not an acceptable outcome of its deliberations. The defendant argues that "the court's instructions misled the jurors by giving them the unwarranted impression that a verdict was required. . . . [T]he court's instructions simply told

them *how* they should continue to deliberate in order to arrive at a verdict, and not that it was permissible for them not to deliver a verdict." (Emphasis in original.)

The defendant adequately preserved his claim that the court's instructions were impermissibly coercive. Because this presents an issue of law, we review the instructions under a plenary standard of review. See, e.g., *State* v. *Carrasquillo*, 191 Conn. App. 665, 680, 216 A.3d 782, cert. denied, 333 Conn. 930, 218 A.3d 69 (2019).

"The possibility of disagreement by the jury is implicit in the requirement of an unanimous verdict and is part of the constitutional safeguard of trial by jury." (Internal quotation marks omitted.) *State* v. *Stankowski*, 184 Conn. 121, 147, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981). We are mindful that "[a] jury that is coerced in its deliberations deprives the defendant of his right to a fair trial under the sixth and fourteenth amendments to the federal constitution, and article first, § 8, of the state constitution. Whether a jury [was] coerced by statements of the trial judge is to be determined by an examination of the record. . . . The question is whether in the context and under the circumstances in which the statements were made, the jury [was], actually, or even probably, misled or coerced . . . . *We recognize that a defendant is not entitled to an instruction that a jury may hang . . . [but] he is entitled to a jury unfettered by an order to decide.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *State* v. *Carrasquillo*, supra, 191 Conn. App. 680. Stated otherwise, in evaluating whether coercion occurred, we do not merely examine the content of the court's instructions but "the context and . . . circumstances in which they were given . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Daley*, 161 Conn. App. 861, 878, 129 A.3d 190 (2015), cert. denied, 320 Conn. 919, 132 A.3d 1093 (2016).

"It is well settled that a Chip Smith charge is an acceptable method of assisting the jury to achieve unanimity. . . . The purpose of the instruction is to prevent a hung jury by urging the jurors to attempt to reach agreement. It is a settled part of Connecticut jurisprudence . . . . Better than any other statement . . . it makes clear the necessity, on the one hand, of unanimity among the jurors in any verdict, and on the other hand the duty of careful consideration by each juror of the views and opinions of each of his fellow jurors . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Feliciano*, 256 Conn. 429, 439, 778 A.2d 812 (2001). "The language of the charge does not direct a verdict, but encourages it." Id., 440.

The trial court's instructions mirrored the deadlocked jury instructions crafted by our Supreme Court in *State* v. *O'Neil*, 261 Conn. 49, 74–75, 801 A.2d 730 (2002). Our Supreme Court affirmed the instructions "as an acceptable method of encouraging a deadlocked jury

to reach a verdict." Id., 75. As the defendant correctly observes, the use of the deadlocked jury instruction set forth in *O'Neil* has been upheld in numerous appellate decisions. In the present case, the defendant asked the court to instruct the jury that it "in no way wish[ed] to suggest or imply *that a verdict should or could be reached in this case . . . .*" (Emphasis added.) See footnote 14 of this opinion. This requested instruction condoned a hung jury. Both this court and our Supreme Court have expressly stated that a defendant is not entitled to an instruction of this nature. See, e.g., *State* v. *Breton*, 235 Conn. 206, 239, 663 A.2d 1026 (1995); *State* v. *Peary*, 176 Conn. 170, 184, 405 A.2d 626 (1978), cert. denied, 441 U.S. 966, 99 S. Ct. 2417, 60 L. Ed. 2d 1072 (1979); *State* v. *Ralls*, 167 Conn. 408, 421, 356 A.2d 147 (1974), overruled on other grounds by *State* v. *Rutan*, 194 Conn. 438, 479 A.2d 1209 (1984); *State* v. *Carrasquillo*, supra, 191 Conn. App. 680; *State* v. *Spyke*, 68 Conn. App. 97, 116, 792 A.2d 93, cert. denied, 261 Conn. 909, 804 A.2d 214 (2002). We reject the defendant's invitation to conclude that the model instructions used in the present case were not an acceptable method of encouraging a deadlocked jury to reach a verdict. As an intermediate court of appeal, we are unable to overrule, reevaluate, or reexamine the propriety of the instruction that has been bestowed by our Supreme Court. See *State* v. *Carrasquillo*, supra, 683.

Moreover, setting aside the *content* of the court's instructions, contrary to the defendant's arguments, there is nothing concerning the *context and circumstances* in which the court delivered its deadlocked jury instructions that leads us to conclude that the use of the instructions in the present case was coercive. The defendant focuses on the fact that, when the jury sent the note to the court, it had already deliberated over the course of three days. During these three days, the jury had requested playback of the victim's forensic interview, the victim's testimony, and B's testimony. As noted previously in this opinion, in its note, the jury expressed its belief that additional deliberation time would not lead to a unanimous verdict. The fact that the jury had engaged in deliberations and requested playback of some of the testimony and evidence prior to sending the note merely reflected, at most, that the jury was fulfilling its duty of carefully considering the evidence. The jury's note, the first and only time that it communicated with the court with respect to an impasse, and the jury's belief that additional deliberation time would not be fruitful, did not make the court's instructions coercive. The note did not refer to hostility among jurors, any indication that jurors had not followed their juror oaths, or any indication that one or more jurors would not continue to follow their juror oaths following additional instruction. Nothing in the context or circumstances made the instructions coercive. Stated otherwise, the defendant has not drawn a

meaningful distinction between the circumstances of the present case and any other case in which a jury had expressed its belief that it was unable to reach a unanimous verdict, thereby prompting the court to deliver deadlocked jury instructions.[16]

Finally, we address the defendant's argument that, "[i]ndeed, the split verdict, which cannot be reconciled with the evidence, signifies there was coercion and that the jurors rendered a compromise verdict because they felt they had no other choice but to agree." Setting aside the issue of whether the split verdict may be reconciled with the evidence, the defendant's attempt to use the split verdict as evidence of coercion is unavailing. As this court has observed, "in the context of a coerciveness claim, a verdict of not guilty with respect to one or more counts does not necessarily shed light on the source of the jury's disagreement or whether the verdict of one or more jurors was the result of coercion rather than conscience." *State* v. *Carrasquillo*, supra, 191 Conn. App. 689–90 n.12.

For the foregoing reasons, we are not persuaded that the court's deadlocked jury instructions were coercive. Thus, the defendant has failed to establish the basis for his claim that the court violated his rights to due process, to a fair and impartial trial, and to be convicted by means of a unanimous verdict.

IV

Finally, the defendant claims that this court, in the exercise of its supervisory authority over the administration of justice, should require trial courts, when delivering deadlocked jury instructions, to instruct the jury that it need not reach a verdict and that jurors have the right to disagree with respect to the proper verdict. We decline to exercise our supervisory authority.

Consistent with the defendant's third claim, he argues that the specific language he sought in his requested instructions is "warranted to protect the defendant's due process rights and right of trial by jury, and to ensure that the jury is not coerced into reaching a verdict." According to the defendant, "[b]ecause the purpose of giving a Chip Smith instruction is to urge jurors to return a verdict . . . there ought to be some language, similar to what [he] proposed, to cure the unevenness of the instruction." (Citation omitted.) The defendant argues that the well established instructions used by the court in the present case did not "avoid the problem of jurors feeling that they must abandon their beliefs because a verdict is required."

The defendant argues that the court's instructions gave precedence to the state's right to obtain a verdict over his right not to be convicted of a crime in the absence of proof beyond a reasonable doubt. The defendant argues that the need for change in the deadlocked jury instructions is demonstrated by the fact that the

jury, having represented that it was deadlocked, returned a verdict in the present case after the court delivered the instructions. He also argues that the jury's verdict represented a "paradoxical split verdict [that] can only be the result of the coercive instruction given by the court."[17]

"It is well settled that [a]ppellate courts possess an inherent supervisory authority over the administration of justice. . . . Supervisory powers are exercised to direct trial courts to adopt judicial procedures that will address matters that are of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Under our supervisory authority, we have adopted rules intended to guide the lower courts in the administration of justice in all aspects of the criminal process. . . . The exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . Indeed, there is no principle that would bar us from exercising our supervisory authority to craft a remedy that might extend beyond the constitutional minimum because articulating a rule of policy and reversing a conviction under our supervisory powers is perfectly in line with the general principle that this court ordinarily invoke[s] [its] supervisory powers to enunciate a rule that is not constitutionally required but that [it] think[s] is preferable as a matter of policy." (Citations omitted; internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 764–65, 91 A.3d 862 (2014).

We decline to exercise our supervisory authority in the present case. In *State* v. *O'Neil*, supra, 261 Conn. 74–75, our Supreme Court, in the exercise of its supervisory authority, crafted the deadlocked jury instructions that have become Connecticut's model instructions and were delivered by the court in the present case. Our Supreme Court exercised its supervisory authority because "jurors should be reminded not to acquiesce in the conclusion of their fellow jurors merely for the sake of arriving at a unanimous verdict." Id., 74. Our Supreme Court explained that it did "not find the language directed at minority view jurors unduly coercive, especially in light of the balancing language reminding jurors not to abandon their conscientiously held beliefs. On the contrary, we believe that the version of the charge that we adopt today for our trial courts most appropriately balances the systemic interest in a unanimous verdict and the defendant's right to have each and every juror vote his or her conscience irrespective of whether such vote results in a hung jury." Id., 75–76. Because our Supreme Court has explicitly addressed the issue of what instructions are proper, it would be

inappropriate for this court to overrule, reevaluate, or reexamine the propriety of the instructions. See *State* v. *Carrasquillo*, supra, 191 Conn. App. 683.

The judgment is affirmed.

In this opinion the other judges concurred.

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[1] The court imposed a sentence of twenty years of incarceration, five of which are mandatory, execution suspended after sixteen years, followed by fifteen years of probation. The jury found the defendant not guilty of two counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a).

[2] In reciting the facts that the jury reasonably could have found in reaching its verdict, we are mindful that, as we noted in footnote 1 of this opinion, the jury found the defendant not guilty of two counts of sexual assault in the first degree. One count of sexual assault required a finding that the defendant had penetrated the victim's anus, and the other count of sexual assault required a finding that the defendant had penetrated the victim's vagina. See General Statutes § 53a-70 (a) (1).

The jury found the defendant guilty of risk of injury to a child in violation of § 53-21 (a) (2), which did not require a finding that penetration had occurred but required a finding that the defendant had contact with the intimate parts of the victim in a sexual and indecent manner that was likely to impair her health or morals.

[3] In this opinion, we will use the initials, rather than full names, of venirepersons to protect their privacy interests.

[4] The state also presented evidence of statements the victim made in her forensic interview, during which she stated that the defendant would kiss her on her mouth when she was going to travel somewhere "really far" away. The victim stated that, when this type of kissing occurred, both her mouth and the defendant's mouth would remain closed. She stated that her grandmother, B, thought the kissing was "kinda weird" and that "no one should be kissing you on your mouth."

[5] Although the state correctly refers in its appellate brief to the fact that our decisional law directs us to consider whether a restriction of voir dire reflects an abuse of discretion or harmful prejudice to a defendant, it also argues that the defendant is unable to demonstrate that he was "harmed" by the court's ruling. The defendant responds that "the state is wrong that any error was harmless" and that "[a] trial before jurors who harbor prejudices that work against the defendant can never be harmless." In accordance with prior decisions, our evaluation of whether reversal of the judgment is warranted is focused on whether the court's ruling constituted an abuse of discretion or whether it resulted in harmful prejudice to the defendant.

[6] As we noted previously in this opinion, following the court's ruling to exclude the photograph of the defendant kissing H on the lips, jury selection continued over the course of three days. During these three days, however, defense counsel did not ask any prospective juror about physical forms of affection.

[7] Despite the many factual similarities, or overlap, between the victim's trial testimony and the victim's forensic interview, our review of these two matters reveals that factual differences do exist. Appellate review of the victim's trial testimony is greatly hampered by the fact that the victim testified while, for demonstrative purposes, pointing to one or more visual aids depicting the human body. In many instances, however, neither the court nor the prosecutor clarified for the record what part of the human body she was pointing to while testifying. The consequence of that failure is that, at times, the record is ambiguous with respect to the most critical facts of the case, namely, the intimate part or parts of the victim's body with which the defendant had made contact. In the victim's trial testimony, she appears to have described the defendant touching her anus and feeling "a sharp pain inside of [her]" but that she "wasn't sure what it was . . . ." While apparently referring to contact with her vagina, she testified that she believed the contact was painful " 'cause [the defendant] tried to go in" and "[i]t didn't work." The victim did not state what the defendant had used to make contact with her, except that he stated that it was "[h]is thumb."

Unlike the victim's trial testimony, in the victim's forensic interview she

added additional details about the defendant's touching of her vagina and anus. Specifically, she stated that, when the defendant was touching "both parts," meaning her vagina and her anus, she "felt something else going inside of me . . . ." The victim also stated that, although the defendant stated that he was using his thumb during the incident, in light of the fact that she felt the defendant's hands on her waist at the time, she believed that it was "[a] man's private."

[8] Later, in the absence of objection by the defendant, the state offered, and the court admitted into evidence, a transcript of the video. The defendant's claim on appeal is limited to the admission of the video but not the transcript. Although we reject the claim that the video was inadmissible and, thus, need not reach the issue of whether the admission of the video amounted to harmful evidentiary error, we observe that the admission of the transcript of the video would pose a significant hurdle to the defendant in attempting to demonstrate that the admission of the video was harmful to him. See footnote 9 of this opinion.

[9] "When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating that the error was harmful. . . . [W]hether [an improper ruling] is harmless in a particular case depends [on] a number of factors, such as the importance of the . . . testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the . . . evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Ayala*, 333 Conn. 225, 231–32, 215 A.3d 116 (2019).

[10] See footnote 7 of this opinion.

[11] The defendant argues that, in the video, Vidro Madigan enhanced the victim's credibility because she indicated to the victim that she believed her allegations. Although, in the video, Vidro Madigan made statements to the victim that could be interpreted as expressions of belief in the victim's statements, we are not persuaded that the jury would have interpreted such statements accordingly. During her testimony, Vidro Madigan explained the techniques that she used in conducting a forensic interview, which included building a rapport with the children she interviewed and making them comfortable so that they can answer questions in a narrative style. Vidro Madigan testified, however, that making a determination as to whether or not the child has made truthful statements was not a part of her job.

[12] The court in *Gould*, having exercised its supervisory authority, also noted that "[the witness] was not the victim of the crimes in this case and her videotaped testimony, which we have reviewed, does not engender the passion, animation or sympathy presented in the videotapes of child victims of sexual abuse." *State* v. *Gould*, supra, 241 Conn. 14. Although the defendant relies on this small portion of the court's analysis, we do not interpret it to be integral to its holding in *Gould* or a rule of admissibility.

[13] A "Chip Smith" charge provides guidance to a deadlocked jury in reaching a verdict. See, e.g., *State* v. *O'Neil*, 261 Conn. 49, 74–75, 801 A.2d 730 (2002).

[14] The defendant requested the following instruction: "Ladies and gentlemen, I have received your note and will now have some further instructions for you at this time. At the outset, let me make it clear to you that it is not the purpose of these instructions to require or even suggest that you reach a verdict in this case. I in no way wish to suggest or imply that a verdict should or could be reached in this case; in fact, our legal system recognizes the right of jurors not to agree. I do think, however, that the following instructions may be of aid to you if, in fact, a verdict can be reached.

"The verdict to which each of you agrees must express your own conclusion and not merely the acquiescence on the conclusion of your fellow jurors. Yet, in order to bring your minds to a unanimous result, you should consider the question you have to decide not only carefully but also with due regard and deference to the opinions of each other.

"In conferring together, you ought to pay proper respect to each other's opinions and listen with an open mind to each other's arguments. If the much greater number of you reach a certain conclusion, dissenting jurors should consider whether their opinion is a reasonable one when the evidence does not lend itself to a similar result in the minds of so many of you who

are equally honest and equally intelligent, who have heard the same evidence with an equal desire to arrive at the truth and under the sanctions of the same oath.

"But please remember this: Do not ever change your mind just because other jurors see things differently or to get the case over with. As I told you before, in the end, your vote must be exactly that—your own vote. As important as it may be for you to reach a unanimous agreement, it is just as important that you do so honestly and in good conscience.

"I now ask you to resume your deliberations with these instructions in mind." (Emphasis in original.)

[15] The court instructed the jury as follows: "Ladies and gentlemen, I'm now going to give you an additional charge, and this charge is when the jury fails to agree. And here is the charge. The instruction[s] that I shall give you now are only to provide you with additional information so that you may return to your deliberations and see whether you can arrive at a verdict. Along these lines, I would like to state the following to you:

"The verdict to which each of you agree must express your own conclusion and not merely acquiesce in the conclusion of your fellow jurors, yet in order to bring your minds to [a] unanimous result, you should consider the question you have to decide, not only carefully, but also with due regard and deference to the opinions of each other.

"In conferring together, you ought to pay proper respect to each other's opinions and listen with an open mind to each other's arguments. If the much greater number of you reach a certain conclusion, dissenting jurors should consider whether their opinion is a reasonable one when the evidence does not lend itself to a similar result in the minds of so many of you who are equally honest and equally intelligent, who have heard the same evidence with an equal desire to arrive at the truth, and under the sanction of the same oath.

"But please remember this, do not ever change your mind just because other jurors see things differently or to get the case over with. As I told you before, in the end, your vote must be exactly that, your own vote. As important as it is for you to reach a unanimous agreement, it is just as important that you do so honestly and in good conscience.

"What I have said to you is not intended to rush you into agreeing on a verdict. Take as much time as you need to discuss this matter. There is no hurry. So with that, you will continue your deliberations. Thank you."

[16] The defendant also argues that the fact that the jury reached a verdict following the court's instructions "indicates the instruction coerced a verdict." Thus, the defendant appears to suggest that any verdict that follows deadlocked jury instructions ipso facto is the product of coercion.

[17] The defendant also refers to model jury instructions in other jurisdictions that, in his view, comport with the language in his requested instructions and make clear that the jury has a right not to agree on a unanimous verdict.